**INLAND RUBBER CORPORATION,**
Plaintiff,

v.

**TRIPLE A TIRE SERVICE, INC., Triple A Tire Service of N. Y., Inc., Philmore Finkelstein, Irving Nissenberg and Charles Katz, Defendants.**

United States District Court
S. D. New York.
Aug. 13, 1963.

See also D.C., 210 F.Supp. 880.

Winer, Neuberger & Sive, New York City, for plaintiff, David Sive, New York City, of counsel.

Hays, Sklar & Herzberg, New York City, for defendants, Howard A. Heffron, and Frederick F. Greenman, Jr., New York City, of counsel.

TYLER, District Judge:

Defendants move to dismiss this action, which sounds in tort and in contract, for lack of jurisdiction of this court of the subject matter. Plaintiff claims that jurisdiction is based on diverse citizenship of the parties (28 U.S.C. § 1332(a) (1)); specifically, it alleges that plaintiff is a citizen of Ohio and that defendants are citizens of New York. Defendants maintain that the corporate plaintiff is in fact a citizen of New York, and that, hence, there is no diversity of citizenship.

Plaintiff, Inland Rubber Corporation (Inland), is incorporated in Ohio and is the wholly owned subsidiary of Mansfield Tire and Rubber Corporation (Mansfield), also an Ohio corporation. Mansfield is in the business of manufacturing rubber tires, primarily at its Ohio plant; it has approximately thirty-two corporate subsidiaries.

Mansfield acquired Inland in 1950. From that time until in or about March, 1962, Inland bought tires manufactured by Mansfield for resale throughout the country. In March, 1962, as the result of a management policy decision, the bulk of Inland's sales force was transferred to Mansfield. Mansfield purchased, at that time, and assigned to Inland in April, 1962, a business engaged in selling rubber tires, primarily truck tires; such selling was chiefly effected by telephone solicitations to using customers. This business, originally incorporated in 1950 as Tire Mart, Inc., had the name VTR, Inc., when purchased by Mansfield.

Upon the assignment of the assets of VTR, Inc. by Mansfield to Inland, the bulk of Inland's activity became centered in New York and Florida. Inland qualified to do business in those states after the April, 1962 assignment.

At the time this action was commenced, in October, 1962[1], the business of Inland consisted of a "dealer division", selling tires to dealers, and a "direct sales division", the above-described enterprise purchased from VTR, Inc. In addition, Inland sold some tires to the federal government and also some tires for export.

The distribution of the executives and personnel of Inland was as follows: The President, Vice-President, Treasurer, and Secretary of Inland all resided in Mansfield, Ohio, the principal office of Mansfield.

These officers were paid by Mansfield and not by Inland, which had no salaried employees in Ohio; these same individuals were for the most part also the principal officers of many other of Mansfield's corporate subsidiaries. Some were also officers of Mansfield.

Both the export and the government contract business of Inland was handled in Mansfield, Ohio by Mansfield personnel. The total combined sales in these two areas constituted a small percentage of Inland's total sales.

All the other business of Inland was at least theoretically under the supervisory control of the corporation's principal officers in Mansfield, Ohio. However, the persons in day-to-day control of Inland's sales operations, and the sales staffs as well, were located in New York and Flori-

[1]. Of course, the situation significant to the present inquiry is the situation as it existed when this suit was instituted.

Mollan v. Torrance, 22 U.S. (9 Wheat.) 537, 6 L.Ed. 154 (1824).

da. The personnel at Inland's New York office numbered thirty-five, and at the Florida office twenty-two. The general manager, credit manager, assistant treasurer, and sales promotion manager, who were in general charge of Inland's operations in New York and Florida, were located in New York.

The locus of other property and activities of Inland was as follows:

Federal income taxes were computed and paid in Ohio. The directors' and shareholders' meetings were in Ohio. The corporate seal and minute book were kept in Ohio.

The New York and Florida offices were each directly billed by Mansfield for tires sold and payments were made from bank accounts locally maintained by each office. Of the combined total sales made by the New York and Florida operations in the period April 1, 1962 to October 31, 1962, the New York office accounted for 67%.

Income and expense statements for the operations in both states were prepared by the assistant treasurer in New York. Credit decisions were made, and credit information kept, by the credit manager in New York. Advertising matter and prospective customer lists originated and were maintained by the sales promotion manager in New York.

Mansfield charged Inland, as it did other of its subsidiaries, a general administration service charge or fee of 5% (of the cost of tires purchased by Inland from Mansfield) to pay for the services performed for the subsidiaries by Mansfield at its Ohio offices.

■ I conclude that the "principal place of business" of Inland, within the meaning of 28 U.S.C. § 1332(c) is in New York State. Since Inland is a New York State citizen and since it is conceded that the defendants are New York citizens, there is, therefore, no federal diversity jurisdiction over this cause and it must be dismissed.

■ It is generally agreed that the "principal place of business" of a corporation, for diversity purposes, depends on the geographical location of substantial corporate activity.

■ There is substantial disagreement, however, as to what relative weights should be given to (i) the overall direction and control of the corporation, and (ii) the bulk of the actual operations, or business, of the corporation, when, as is at least arguably true in the present case, these are located in different states.[2]

■ When this issue of priorities is treated in the abstract, it is, of course, a difficult one to answer. Nonetheless, I conclude that there is much in the legislative history of Section 1332(c) which makes it necessary to regard the locus of corporate operations as a more important factor than the locus of over-all policy direction or control in determining the "principal place of business" of a corporation.

The legislation which became Section 1332(c) was originally drawn by the Committee on Jurisdiction and Venue, of the Judicial Conference of the United States.[3]

The statute originally proposed by the Committee read (amending 28 U.S.C. § 1332):

"(c) For the purposes of this section and of section 1441 of this title

---

2. See, e. g., Textron Electronics, Inc. v. Unholtz-Dickie Corp., 193 F.Supp. 456, 458 (D.Conn.1961). The distinction between the "operations" of a corporation and the activities of those who "direct" it may be a difficult one to draw. The distinction is made clearer, however, by restricting the former concept to "over-all direction", that is to the top echelons of management and, conversely, by counting the bulk of administrative and executive personnel as part of the "operations" of the corporation. See text at footnote 14, post. In any event, the locus of "operations" will normally also be the locus of those "corporate personnel who direct the daily operations of the business * * *". K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310, 314 (S.D. N.Y.1961).

3. 2 U.S.Code Cong. & Admin.News 3114 (1958).

a corporation shall be deemed a citizen of any State by which it has been incorporated. For these purposes it shall also be deemed a citizen of a State from business transacted within which it derived more than half its gross income during the fiscal year last preceding the commencement of the action, if it is brought under this section, or preceding the filing of the petition for removal under section 1446." [4]

This suggested legislation was submitted to the Judicial Conference of the United States by the Committee on Jurisdiction and Venue in a report dated March 21, 1951.

On September 24, 1951, apparently after judicial conferences of some or all of the Circuits took the opportunity to review this proposed legislation, the Committee on Jurisdiction and Venue reported to the Judicial Conference as follows (in pertinent part):

"After consideration the committee now proposes a modification of its second recommendation to conform to the resolution on the subject of the judicial conference of the 10th circuit. Accordingly we recommend that section 1332 of the Revised Judicial Code be amended so as to provide that a corporation may not invoke the Federal jurisdiction · in a State where it has its principal place of business." [5]

In an "attachment" to its report, the Committee set forth the proposed statutory language as follows:

"(c) For the purpose of this section and of section 1441 of this title

a corporation shall be deemed a citizen of the State of its original creation. For these purposes it shall also be deemed a citizen of a State where it has its principal place of business."

Further, the Committee explained its proposal as follows (in part):

"* * * the Committee had concluded to follow a recommendation of the 10th circuit, which would substitute for the formula based upon net income, the standard specified in the jurisdictional sections of the Bankruptcy Act (U.S.C., title 11, sec. 11) which rests the matter upon the principal place of business of the corporation * * *. Accordingly the Committee recommended that the Conference approve its * * * recommendation[s] as follows:

\* \* \* \* \* \*

"(2) That section 1332 of the Revised Judicial Code be amended to provide that in cases based upon diversity of citizenship a corporation shall be deemed a citizen both of the State of its creation and the State in which it has its principal place of business * * *" [6]

The legislation was ultimately enacted in substantially this form. [7]

Several illuminating considerations are engendered by this legislative history.

The original proposal of the Committee on Jurisdiction and Venue, based on the locus where the bulk of the corporation's income-producing "business [is] transacted", turned principally, if not exclusively, upon the place of the physical, or business, operations of the corporation. [8]

4. 2 U.S.Code Cong. & Admin.News 3126 (1958).

5. 2 U.S.Code Cong. & Admin.News 3132 (1958).

6. 2 U.S.Code Cong. & Admin.News 3133 (1958).

7. 72 Stat. 415 (1958). "(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

8. The Committee stated: "A corporation which receives more than half of its gross income from business within a single State is so closely tied to the local commercial fabric of that State as to be properly considered a citizen thereof \* \* \*." 2 U.S.Code Cong. & Admin. News 3120 (1958).

494

Though I find nothing expressly on the point [9], it seems reasonable to infer that the purpose behind the suggestion, and adoption, of the Bankruptcy Act's principal place of business standard was to promote certainty by incorporating into the statute a body of decisional law. If this is correct, then the substitution of this Bankruptcy Act formula should not be read in derogation of the intent, implicit in the original draft, to make controlling the locus of the corporation's actual operations.

Such an interpretation is further buttressed by the following observations:

Clearly, there exist many corporations whose activities are more or less evenly divided among several or many of the states, so that no one state has a substantially larger share of these operations than any other single state. But this means, in turn, that if "principal place of business" is defined by a predominance of operations in one state, then corporations of this type have no "principal place of business".

Yet, the statute as enacted contains the implicit assumption that all corporations do have a principal place of business. (" * * * citizen of * * * the State where it has its principal place of business. * * * ") (emphasis added).

Arguably, this is suggestive of a legislative intent to lay chief stress on the locus of over-all corporate control, at least in the case of corporations with multi-state activities, since over-all control would rarely, if ever, be geographically distributed among several states.

But, interestingly enough, the history of this statute largely belies such reasoning.

The original proposal of the Committee on Jurisdiction and Venue, it is true, contemplated that many corporations would have no "principal place of business".

Thus, under the original proposal, a corporation which did not earn more than half its revenue from operations in any single state would have no "principal place of business" for citizenship purposes. This possibility was, of course, reflected in the wording of the proposed statute. (" * * * shall be deemed a citizen of a state from business transacted within which * * * ") (emphasis added).

A review of the above-quoted excerpts from the September 24 report of the Committee on Jurisdiction and Venue, will disclose that substitution of the phrase " * * * the state * * * " in place of the phrase " * * * a state * * * " must have been made without attention to any substantive changes implicit therein, since the two phrases are used interchangeably in the Committee's report.

This point weakens any construction of Section 1332(c) which would seek to draw significance from this aspect of its wording. It also re-enforces the conclusion that the Bankruptcy Act's "principal place of business" formula was adopted by the Committee with neither thought for, nor intention to cause, change in the substantive principle to be used in defining corporate citizenship.

This governing principle, of course, was that the locus of corporate operations, when one state had a predominance of them, was to determine citizenship.

The report of the Judiciary Committee of the Senate on 28 U.S.C. § 1332(c) is very brief [10] and not entirely clear on the issue under discussion. But, on balance, this report, too, indicates that the emphasis should be placed on the locus of corporate operations.

The report states that the legislation "will eliminate [from federal diversity jurisdiction] those corporations doing a local business with a foreign charter but

9. All legislative materials to which this court has referred, other than the Congressional Record, are contained in 2 U.S.Code Cong. & Admin.News 3114–3136 (1958).

10. Sen.Rept. No. 1830, to accompany H.R. 11102. 85th Cong.2d Sess., 1958. 2 U.S. Code Cong. & Admin.News 3099–3113 (1958). The portion dealing with the diversity of citizenship of corporations is one page in length, at pp. 3101–02.

will not eliminate those corporations which do business over a large number of States, such as the railroads, insurance companies, and other corporations whose businesses are not localized in one particular State. Even such a corporation, however, would be regarded as a citizen of that one of the States in which was located its principal place of business."[11]

Repeated use of the phrase "doing business", (and similar phrases), both in the report of the Senate Judiciary Committee[12], as well as during the debates on the floor of the House of Representatives[12], suggests that the legislators were intent upon tying, so far as reasonably possible, corporate citizenship to the realities of corporate business activity.

Finally, it may be pointed out that the Senate Judiciary Committee adopted the view that "[t]he underlying purpose of diversity of citizenship legislation * * * is to provide a separate forum for out-of-State citizens against the prejudices of local courts and local juries * * *."[13]

If the Committee regarded this as the principle underlying diversity jurisdiction, then, *pro tanto*, it must have envisioned a test based chiefly on operations, since it is by visible presence, including the employment of local people[14], that a corporation will become popularly recognized as "domestic" rather than "foreign".

The cases have uniformly accepted as controlling the statements of the Committee on Jurisdiction and Venue, and of the Senate Judiciary Committee, that the standard for "principal place of business" set forth in the Bankruptcy Act (11 U.S.C. § 11) is to be applied in Section 1332(c).

The case law under the Bankruptcy Act, on the issue under discussion, is fairly summed up by the statement in 1 Collier Bankruptcy § 2.19, pp. 202–3 (14th Ed., 1962): "There is some conflict in the cases as to whether the principal place of business is located at the general executive offices where the business affairs of the corporation are managed or in the district of the factories, mills, or mines of the corporation".

I concur in the observation made by another judge of this court in an effort to harmonize these two strains of conflicting authority, that: " * * * [I]n the cases usually cited for the former proposition [i. e., that the locus of the general executive offices is controlling], there does not seem to have been any business at all to speak of in the contending district." In re Hudik-Ross Co., 198 F.Supp. 695, 699 (S.D.N.Y.1961), aff'd, sub nom In re S. O. S. Sheet Metal Co., 297 F.2d 32 (2d Cir., 1961).

Notwithstanding this, the fact remains that not all the cases can be distinguished on this basis and that subtantial conflict does remain. This fact reinforces the cogency of the proposition that although the Bankruptcy Act formula was adopted as the basis for Section 1332(c), it is nonetheless the principles and policies underpinning Section 1332(c) which should be the significant touchstones for construction of its language.[15]

---

11. 2 U.S.Code Cong. & Admin.News 3102 (1958).

12. The phrase "doing business" recurs several times in the Committee report as being the operative factor in determining citizenship. The same is true of the remarks made in the House debate on § 1332(c). E. g.: Representative Smith, 104 Cong.Rec. 12683 (1958) (columns 2, 3); Representative Keating, 104 Cong.Rec. 12688 (column 1, paragraphs 2, 4). Moreover, it might be supposed that litigation would usually take place in the state where the cause of action arose and that this would nor-

mally be at the situs of corporate operations. Therefore, the most effective contraction of federal diversity jurisdiction, in conformance with realistic notions of "citizenship", would also place emphasis on the place of the corporation's physical operations.

13. 2 U.S.Code Cong. & Admin.News 3102 (1958).

14. See footnote 2, supra.

15. Though it may be noted that the policy considerations which underlie application of the "principal place of business" test in the setting of the Bankruptcy Act

As noted above, the legislative history of Section 1332(c) suggests that by far the dominant emphasis should be placed on the locus of the operations of the corporation.

■ Thus, if any one state contains a substantial predominance of corporate operations, including personnel, as compared with any other single state, then in that state lies the "principal place of business" of the corporation within the meaning of 28 U.S.C. § 1332(c).

This holds true even though, as is at least arguably the situation in the case at bar, the locus of over-all direction and control lies in another state.[16]

It is by the application of these principles to the facts at bar that I find there is a substantial predominance of the business operations of Inland in New York State, and that, accordingly, its principal place of business, within the meaning of Section 1332(c), is located in New York.

The business of Inland is the sale of rubber tires. For the relevant period, sales made from Ohio were minimal. Those from New York were, volume-wise, twice those from Florida. Day-to-day control of the operations was exercised from New York and Florida. The relative importance of the enterprises in New York and Florida was reflected in the number of supervisory and other personnel at each, and in the fact that various of the New York personnel had supervisory authority over the Florida operation.

It is true, of course, that Mansfield, Ohio, was the locus of over-all control of Inland, as of many other Mansfield subsidiaries. Inland, however, employed no personnel in Mansfield, Ohio. Since a substantially greater share of Inland's business operations took place in New York than in any other state, New York is its principal place of business, notwithstanding that the locus of over-all direction and control of Inland may have been in Mansfield, Ohio.

This action is dismissed for lack of jurisdiction of this court of its subject matter. Particularly in view of the history of this litigation in this and other courts, the parties are directed to submit an order to reflect the foregoing disposition.

may be closely similar to those applicable in § 1332(c). See, Dryden v. Ranger Refining & Pipe Line Co., 280 Fed. 257, 262 (5th Cir., 1922) (applying Bankruptcy Act standard; 11 U.S.C. § 11) (locus of "principal dealings with the public" should be the main test in view of the purposes and policies which underlie the "principal place of business" standard). It should also be noted that the units for "principal place of business" under the Bankruptcy Act are the federal districts, rather than, as under § 1332, the states of the union. Determining the relative quantities of corporate operations in individual states should be somewhat less difficult than seeking to make the same analysis for federal districts, which are normally smaller geographical units. Reasonable policy considerations might point, therefore, to a greater viability for a predominance of operations test under § 1332(c) than under the Bankruptcy Act.

16. Thus, the locus of "over-all direction and control" will be used to determine the principal place of business only when the use of such a "rule of convenience", Note, 58 Col.L.Rev. 1286, 1297 (1958), is made necessary by the absence of any state of operational predominance. It is true that this restrictive definition of the "nerve center" test may be at odds with the rule set down by this court in Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862, 865 (S.D.N.Y.1959). Nonetheless, it appears probable that the rule of that case would yield the same result as that reached herein, and hence the cases are not, strictly speaking, in conflict. Similarly, the decision here is not inconsistent with the decision of the Court of Appeals for this Circuit in In re Hudson River Nav. Corp., 59 F.2d 971 (2d Cir., 1932) since I read that decision's application of the "nerve center" test to rest on the facts that the corporation's business there involved was inter-federal district river transportation and that there was a predominence of operations and fixed assets (such as terminals) in neither contending district.