The **LURIE COMPANY**, a California corporation, Plaintiff,

v.

**LOEW'S SAN FRANCISCO HOTEL CORP.,** a Delaware corporation, Defendant.

Civ. No. 49175.

United States District Court, N. D. California.

July 27, 1970.

Frederick P. Furth, San Francisco, Cal., for plaintiff.

Moses Lasky, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## ORDER

JAMESON, District Judge.

Defendant has moved to dismiss for lack of jurisdiction on the grounds that (1) the complaint fails to allege diversity of citizenship in that it fails to allege the principal place of business of either plaintiff or defendant; and (2) the principal place of business of defendant is in fact in the state of California, and as California is the state of incorporation of the plaintiff, there is no diversity of citizenship.

A hearing was held on July 16, 1970. Prior thereto the respective parties either submitted affidavits or conducted appropriate discovery through depositions and written interrogatories. Written briefs were filed and oral arguments were presented at the hearing.

Rule 12(d) of the Federal Rules of Civil Procedure provides for a preliminary hearing for determining before trial defenses raised by motions specified in Rule 12(b). It is "advisable generally to decide such defenses as * * * lack of jurisdiction * * * promptly after they are raised, and not defer them to the trial." 2A Moore's Federal Practice 2354, ¶ 12.16.

As a general rule the "trial court may, in its discretion, hear and determine issues of fact as to jurisdiction by receiving oral testimony and other evidence * * * or by receiving and weighing affidavits." [1] After weighing the evi-

---

1. The use of affidavits in hearings under Rule 12(d) is proper. While the rule itself does not specify the type of evidence which may be presented, Rule 43(e)

dence "received upon an inquiry into the facts as to jurisdiction, the court properly makes findings as to the existence or nonexistence of requisite jurisdictional facts and draws conclusions of law upon which to predicate its order." Williams v. Minnesota Mining & Manufacturing Co., S.D.Cal.1953, 14 F.R.D. 1, 5.

The complaint alleges that plaintiff is a California corporation and defendant a Delaware corporation. There is no allegation with respect to the principal place of business of either corporation.[2]

28 U.S.C. § 1332(c), as amended in 1958, provides that for the purpose of determining diversity of citizenship "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." The complaint is defective in failing to allege a necessary fact to confer diversity jurisdiction, i. e., the principal place of business of the respective parties. Brandt v. Bay City Super Market, N.D.Cal.1960, 182 F.Supp. 937. Plaintiff contends, however, that the defendant corporation has its principal place of business in the State of New York. For the purpose of determining this motion, it is assumed that the complaint has been amended to contain this allegation.[3]

Accordingly we are concerned with the question of whether the defendant's principal place of business within the meaning of § 1332(c) is in California, as defendant contends, or in New York, as plaintiff contends.

The defendant, Loew's San Francisco Hotel Corporation, was incorporated in Delaware in 1967 for the purpose of leasing and operating the Hotel Mark Hopkins in San Francisco. It conducts no corporate activities in Delaware, but has a statutory office in the suite of the Prentiss Hall corporation system. It is a wholly owned subsidiary of Loew's Theaters Inc., which has its principal or home office in New York City. Defendant's officers and directors are also officers and directors of the parent corporation. They receive no salary from the defendant.

Defendant qualified to do business in California four days after it was incorporated. It has never qualified to do business in New York or any state other than California. Its sole business is the operation of the Hotel Mark Hopkins and its only assets are the leasehold of the hotel, a second deed of trust on the hotel, and supplies, cash, and receivables arising from the operation of the hotel. The leasehold and trust were acquired under the agreements which are at issue in this action. These agreements were executed in San Francisco.

The initial meeting of the directors was held in San Francisco. Subsequent meetings have been held in the New York office of the parent corporation, where the corporate seal, minute book, and other corporate records are kept.

All income of the defendant is earned in San Francisco. It files income tax returns in the state of California and pays corporate income taxes to that state. It pays no income or franchise tax to the state of New York. Defendant has five bank accounts, all maintained in San Francisco banks.

The officers of the defendant live and maintain their offices in New York, as do its chief legal advisers, chief fiscal officer, insurance adviser, officers in charge of leasing commercial space and supervising the preparation of tax re-

provides that, "When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions."

2. Personal service of summons and complaint was made in San Francisco upon defendant's "Managing Director authorized to accept service of process on behalf" of defendant.

3. At hearing and pretrial conference on April 1, 1970, it was agreed that plaintiff would file an amended complaint alleging the principal place of business of the respective parties, if the court finds that it has jurisdiction.

turns, and accounting supervisor. Approximately 480 other employees, all engaged in operation of the Hotel Mark Hopkins in San Francisco, work and reside in California, and most of them are full time employees. All employees, other than the officers and hotel manager and auditor, are hired and fired in San Francisco. All payroll is paid in San Francisco, except the salary of the hotel manager. The local manager is responsible for collective bargaining agreements with the union employees.

The parent corporation is also the sole stockholder in several other hotel operating corporations, each of which operates one hotel in a state other than California. The expenses of the executive offices are charged, in varying percentages, to the parent's theater operations and several hotel operating subsidiaries. Two percent of the expenses of the executive offices are charged to the defendant, and the portion of certain supervisory services charged to the defendant ranges from two to six percent.

The officers and directors of the parent corporation formulate the "overall policy" for all of the hotels and review their operating records. The New York office handles the national advertising for all of the hotels, the preparation of tax returns and payment of taxes, the negotiation and execution of license agreements, leases, and other types of concession agreements,[4] the billing of concessionaires and permanent guests, the hiring and firing of local managers, payment of the local managers, and maintains the corporate records, including ledgers,[5] insurance policies and leases. Separate corporate records are

maintained for each corporation, separate income tax returns are filed, and separate financial statements are issued.

The total cost of the operations of the defendant incurred in San Francisco averages about $500,000 per month, and the total charge for every type of service performed by anyone outside of California, in New York or elsewhere, has averaged about $15,000 per month.[6] The defendant in San Francisco has its own purchasing department and buys virtually all of its supplies, beverages and other operating requirements. Capital expenditures exceeding $500 on any one item require the approval of the New York office. They are made upon the recommendation of the hotel manager and usually included in the annual budget.

In support of its contention that New York is the defendant's "principal place of business", plaintiff argues that (1) "defendant has repeatedly declared, throughout its corporate history, that its principal place of business is New York"; (2) the officers and directors of defendant maintain their offices in New York and "overall" policy decisions are made there; and (3) New York is the "center of corporate activity" or "place of operations" by reason of (a) the involvement of New York personnel in the day to day management of defendant, and (b) the "degree of centralization in the management of the parent corporation and its subsidiaries."

On its first point plaintiff refers to four documents: Annual reports for 1967 and 1968, filed with the Secretary of State of Delaware, in which defendant lists its principal place of business

---

4. The agreements all relate to space in the Hotel Mark Hopkins and refer to defendant as "Loew's San Francisco Hotel Corporation, a Delaware corporation, having a place of business at 999 California Street, San Francisco, California."

5. "Source documents, all original records", however, are kept at the hotel in San Francisco and audits are made there. In essence the bookkeeping is done in

California, and subsequent accounting, in New York.

6. This does not include expenditures in an amount between $675,000 and $1,000,000 for refurbishing the hotel made pursuant to a provision in the agreement between plaintiff and defendant that defendant would spend a minimum of $675,000 for this purpose. The refurbishing was all done in California and is not strictly speaking an operational expense.

outside Delaware as 1540 Broadway, New York, New York, which is the home office address of the parent corporation;[7] an "Application for Extension of Time for Filing Return" submitted to the Franchise Tax Board of California, in which defendant's "address" is given as 1540 Broadway, New York; and a "Statement and Designation by Foreign Corporation" filed with the Secretary of the State of California, in which the same address is given by defendant as the "location and address of its main office."

In support of its contention that day-to-day operations are controlled by the New York office, plaintiff argues, inter alia, that room charges are controlled by the home office;[8] the home office instructed defendant on how to answer complaint letters[9] and what types of scotch and bourbon to use; while operating expenses are paid from the account of the defendant, the only persons authorized to draw on this account are the defendant's officers who reside in New York;[10] the scope of the hotel menu was approved by the New York food department;[11] the hotel adopted five of seven salad dressings recommended by the New York office; and a daily revenue report is compiled in New York on the basis of information transmitted from San Francisco via "Data-

phone" and the local manager does not receive the report for five or six days.[12]

The hotel manager testified in his deposition that he directs the "day-to-day activities of the hotel" and makes "the day-to-day decisions that have to be made"; that he does not report to anyone concerning the day-to-day operations, and that no decision he has made has been "countermanded by anyone whose office is in New York." He would call on the home office in an "emergency". Similar testimony was given by the hotel auditor.

In summary, the defendant corporation was organized by the officers of a parent corporation, with its principal office in New York, for the purpose of leasing and operating a hotel in California. The defendant, a Delaware corporation, is qualified to do business in California, but not in New York. It pays income and other taxes in California, but not in New York. The only asset of the defendant is the hotel in California, and the "actual operations" of the hotel are conducted in California, subject to overall direction and control from the office of the parent corporation in New York, which is the sole stockholder of defendant. The parent corporation is also the sole stockholder in several other hotel corporations, each of which operates one hotel in a state other than Cali-

---

7. These were filed in connection with an annual report for tax purposes on a form containing a place to show the corporation's principal place of business. No taxes have been paid in Delaware, except the annual franchise fee of $10.

8. The maximum and minimum rates are determined in the New York office as a part of overall policy. The application of the rate structure to individual rooms is left to the hotel manager.

9. It appears from the deposition of the hotel manager that a few complaints were received in New York, were responded to by an officer of the defendant and then sent to the hotel manager who also personally answered them, but that four out of five complaints were directed to the Mark Hopkins Hotel and answered by the manager in San Francisco.

10. The decisions on how the money is to be expended are made in San Francisco, and all invoices are approved there. Personnel in the hotel management are authorized to draw on the "payroll account" and "exchange account", the latter used primarily for refund on room deposits.

11. The menu and menu prices are prepared in the hotel at San Francisco by the manager and his assistants. The parent corporation, however, has another subsidiary corporation known as "Marcus Loew Booking Agency", which provides assistance and advice and makes recommendations with respect to beverage, food, and other services for all the hotel subsidiaries.

12. It does appear, however, that the local manager reviews the daily revenue report before it is sent to the computer in New York.

fornia. The parent corporation formulates the "overall policy" for all of the hotels and reviews their operating records. Through another subsidiary corporation advice and assistance are available and recommendations are made on beverages, food, and other services to all of the hotel subsidiaries. The defendant's hotel manager in San Francisco directs the day-to-day activities and makes the day-to-day decisions, but his actions and decisions are subject to the control of the parent corporation's home office in New York. Taxes are paid, insurance policies are purchased, and the corporate records for each corporation are maintained at the office of the parent corporation. Separate records are maintained for each subsidiary corporation, and the expenses of the executive office are charged in varying percentages to the parent's theater operations and hotel subsidiaries.[13]

■ It is well established that a "subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business; and, accordingly, may possess dual citizenship if such place is located in a different state from that in which it is chartered." 1 Moore's Federal Practice 717.-

10, ¶ 0.77[1.–2]. Where the corporate separation between a parent and subsidiary, "though perhaps merely formal", is "real" and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through corporate ownership or otherwise. Cannon Mfg. Co. v. Cudahy Packing Co., 1925, 267 U.S. 333, 45 S.Ct. 250, 69 L. Ed. 634.[14]

■ With this background, we come to the question here presented: whether under the facts set forth above the "principal place of business" of defendant within the meaning of § 1332(c), as amended, is the State of New York under the so-called "nerve center", "home office", or "place of corporate activity" theory, as contended by plaintiff, or the State of California under the "place of operations theory", through actual business operations in that state, as contended by defendant. It may be noted at the outset that in federal court the burden of proving all jurisdictional facts rests upon the plaintiff or person asserting that the court has jurisdiction. McNutt v. General Motors Acceptance Corporation, 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135;[15] Birmingham Post Compa-

---

13. The control by the parent corporation is not essentially different from that exercised by many parent corporations in operating various types of business through subsidiary corporations in different states.

14. While an entirely different question was presented in Cannon, i. e., whether the parent corporation was doing business in the state of incorporation of the subsidiary, the opinion clearly recognizes that the subsidiary corporation may have a place of business wholly distinct from the parent corporation even though the parent corporation "through ownership of the entire capital stock and otherwise" dominates the subsidiary corporation, "immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated * * *." The opinion continued: "The

existence of the Alabama (subsidiary) Company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general Cudahy business was doubtless adopted solely to secure to the defendant some advantage under the local laws." 267 U.S. at 335, 45 S.Ct. at 251. See also Gravely Motor Plow & Cultivator Co. v. H. V. Carter Co., 9 Cir. 1951, 193 F.2d 158.

15. The Court said in part: "The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in

ny v. Brown, 5 Cir. 1954, 217 F.2d 127 and cases there cited.

The 1958 amendment to § 1332(c) was enacted in an "effort to reduce the number of cases coming to federal courts on the ground of diversity of citizenship only." Kelly v. U. S. Steel Corporation, 3 Cir. 1960, 284 F.2d 850, 852.[16] In determining the principal place of business it is necessary for the court to balance all of the significant facts. Some courts have resolved the issue on the basis of the home office or "nerve center" of the corporation; others on the basis of the "place of operations." A more inclusive and perhaps truly accurate test was applied in Kelly v. U. S. Steel Corporation, supra, i. e., "the headquarters of day-to-day corporate activities and management." 284 F.2d at 854.[17]

It is true, as plaintiff contends, that some cases in determining a corporation's principal place of business for the purposes of section 1332(c) have given paramount weight to the location of the home office or "nerve center" of the corporation. A leading case under this theory is Scot Typewriter Co. v. Underwood Corp., S.D.N.Y.1959, 170 F.Supp. 862. Underwood Corporation had three principal manufacturing plants, one in Connecticut, one in New Jersey, and one in California. The court found the "nerve center" or "center of gravity" to be the state of New York, where most of the

higher officers maintained their offices, policy decisions were made, and income tax returns filed. The court said in part:

"Where a corporation is engaged in multistate activities, with offices, facilities or plants in various states, the issues of the location of its principal place of business cannot be resolved by fragmentation of its activities at specific places. It is not answered by a separation of corporate activity into component parts. The issue must be resolved on an over-all basis. It is governed by the totality of corporate activity at a given place, which, to borrow a phrase from another area of law, may be said to represent the 'center of gravity' of corporate function.

" * * * *

"Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. The test applied by our Court of Appeals, is that place where the corporation has an 'office from which its business was directed and controlled'—the place where 'all of its business was under

---

any appropriate manner, he must support them by competent proof. And where they are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence. We think that only in this way may the practice of the District Courts be harmonized with the true intent of the statute which clothes them with adequate authority and imposes upon them a correlative duty." 298 U.S. 178, at 189, 56 S.Ct. 780, at 785.

16. Citing S.Rep. No. 1830, 85th Cong., 2d Sess. (1958) U.S.Code Cong. and Adm.

News 1958, pp. 3099, 3100, and concluding that, "The text under the heading 'Statement' makes clear the purpose of Congress." N. 2, 284 F.2d at 852.

17. The court found that U. S. Steel had its principal place of business in Pennsylvania, even though its Board of Directors met regularly in New York, and the corporation carried on its major banking activities, filed its income tax return, mailed its annual reports and declared its dividends in New York. Judge Goodrich did not find the "nerve center" test helpful and turned "from a pleasant and alluring figure of speech to a consideration of the facts of the Steel Corporation's life." 284 F.2d at 853.

the supreme direction and control of its officer'." 170 F.Supp. at 864, 865.[18]

After referring to Scot Typewriter Co. v. Underwood Corp., Professor Moore states that, "The nerve center approach has been frequently employed in locating the principal place of business of other wide-spread corporations, and of holding companies or parent corporations with operating subsidiaries in several states." In distinguishing those cases from cases involving a corporation which has substantial operations in only one state, Professor Moore says: "Indeed, it has been suggested that the home office or nerve center test is properly applicable only to those corporations which have substantial operations (other than executive offices) in two or more states." 1 Moore's Federal Practice 717.69, ¶ 0.77[3.–2].

In summarizing the trends concerning the principal place of business provision of the 1958 amendment to § 1332(c), Professor Moore says in part: "An increasing number of cases are limiting the application of the home office or nerve center test to those corporations 'engaged in far-flung and varied activities which are carried out in different states.' Where, however, the corporation has its physical operations concentrated in one state and its administrative or executive offices in another state, the place of operations is more frequently considered as decisive." 1 Moore's Federal Practice 717.77, ¶ 0.77[3.–4].

Both parties rely upon cases decided in the Southern District of New York— plaintiff upon Scot Typewriter Co. v. Underwood Corp., supra, and Chu v. Plastic Systems Corporation, 1969, 308 F.Supp. 1189, and defendant upon Inland Rubber Corp. v. Triple A Tire Service, Inc., 1963, 220 F.Supp. 490 and Spector v. Rex Sierra Gold Corp., 1964, 227 F.Supp. 550. Most nearly in point factually is Inland Rubber Corp. v. Triple A Tire Service, Inc. Inland, an Ohio corporation, was the wholly owned subsidiary of Mansfield Tire and Rubber Corporation, also an Ohio corporation. Mansfield was engaged in the business of manufacturing rubber tires and had approximately 32 corporate subsidiaries. Inland carried on most of its activities in New York and Florida. Its officers resided in Mansfield, Ohio, the principal office of Mansfield. They were paid by Mansfield and were also officers of others of Mansfield's corporate subsidiaries. Other facts showing its similarity to the instant case were stated by the court as follows:

"Both the export and the government contract business of Inland was handled in Mansfield, Ohio by Mansfield personnel. The total combined sales in these two areas constituted a small percentage of Inland's total sales.

"All the other business of Inland was at least theoretically under the supervisory control of the corporation's principal officers in Mansfield, Ohio. However, the persons in day-to-day control of Inland's sales operations, and the sales staffs as well, were located in New York and Florida. The personnel at Inland's New York office numbered thirty-five, and at the Florida office twenty-two. The general manager, credit manager, as-

18. Most of the cases applying the "nerve center" test involved large multistate corporations, including S.T.P. Corp. v. United States Auto Club, Inc., S.D.Ind. 1968, 286 F.Supp. 146 (test applied to Studebaker Corporation) ; Textron Electronics, Inc. v. Unholtz-Dickie Corp., D. Conn.1961, 193 F.Supp. 456 (widely distributed corporate structure with both domestic & foreign subsidiaries) ; Sabo v. Standard Oil Co. of Indiana, 7 Cir. 1961, 295 F.2d 893 (applied test to Standard Oil of Indiana) ; United Nuclear Corp. v. Moki Oil & Rare Metals Co., 10 Cir. 1966, 364 F.2d 568, cert. denied 385 U.S. 960, 87 S.Ct. 393, 17 L.Ed.2d 306 (1966), (United Nuclear is a vertically integrated corporation which had mines and plants in a number of states).

sistant treasurer, and sales promotion manager, who were in general charge of Inland's operations in New York and Florida, were located in New York.

"The locus of other property and activities of Inland was as follows:

"Federal income taxes were computed and paid in Ohio. The directors' and shareholders' meetings were in Ohio. The corporate seal and minute book were kept in Ohio.

"The New York and Florida offices were each directly billed by Mansfield for tires sold and payments were made from bank accounts locally maintained by each office. Of the combined total sales made by the New York and Florida operations in the period April 1, 1962 to October 31, 1962, the New York office accounted for 67%.

"Income and expense statements for the operations in both states were prepared by the assistant treasurer in New York. Credit decisions were made, and credit information kept, by the credit manager in New York. Advertising matter and prospective customer lists originated and were maintained by the sales promotion manager in New York.

"Mansfield charged Inland, as it did other of its subsidiaries, a general administration service charge or fee of 5% (of the cost of tires purchased by Inland from Mansfield) to pay for the services performed for the subsidiaries by Mansfield at its Ohio offices." 220 F.Supp. at 491, 492.

In rejecting the "nerve center" test and holding that New York rather than Ohio was Inland's principal place of business the court said:

"It is true, of course, that Mansfield, Ohio, was the locus of over-all control of Inland, as of many other Mansfield subsidiaries. Inland, however, employed no personnel in Mansfield, Ohio. Since a substantially greater share of Inland's business operations took place in New York than in any other place of business, notwithstanding that the locus of over-all direction and control of Inland may have been in Mansfield, Ohio." 220 F.Supp. at 496.[19]

Inland Rubber was followed in Spector v. Rex Sierra Gold Corporation, supra, where, as here, the defendant was incorporated in Delaware and promptly qualified to do business in California, where it conducted mining operations. The defendant maintained an office in New York where its officers resided, its corporation records were kept, and its directors' meetings were held. It maintained a bank account in New York and corporate expenses were paid from there. Its mining operations were conducted in California. In holding the "nerve center" doctrine "clearly inapplicable", Judge Bonsal said in part: "Indeed, by promptly qualifying in California following incorporation, and failure to qualify in New York, it would appear conclusive that defendant considered its principal place of business to be California." 227 F.Supp. at 551.

■ Plaintiff attempts to distinguish Inland Rubber and Spector on the ground that in those cases it was the foreign corporation which sought to invoke federal jurisdiction. It is true, as plaintiff argues, that one purpose of the

19. This case also contains a comprehensive discussion of the legislative history of the 1958 amendment to § 1332(c) and concludes that the legislative history "suggests that by far the dominant emphasis should be placed on the locus of the operations of the corporation." In a footnote the court suggests "the locus of 'over-all direction and control' will be used to determine the principal place of business only when the use of such a 'rule of convenience' * * * is made necessary by the absence of any state of operational predominance." It recognizes that its restricted definition of the "nerve center test" may be at odds with the prior decision of another judge of that court in Scot Typewriter Co. v. Underwood Corp., supra, but concludes that the two cases "are not, strictly speaking, in conflict." 220 F.Supp. at 496 n. 16.

1958 amendment was to prevent an essentially local corporation from invoking diversity jurisdiction by the device of incorporating in some other state. Plaintiff then argues that this case is distinguishable since plaintiff, a local corporation, has invoked federal jurisdiction, while defendant seeks to *avoid* it. Under plaintiff's construction of the statute, a local corporation would have the choice of a federal forum which would be denied a foreign corporation with its principal place of business within the state. A similar contention was rejected in Canton v. Angelina Casualty Company, 5 Cir. 1960, 279 F.2d 553. There Texas plaintiffs sought to maintain an action in the federal court against a Delaware corporation. The court found that the defendant's principal place of business was Texas, and said in part:

> "The statute prevents a corporation, essentially local, from taking advantage of being chartered in a foreign state. At the same time it also prevents local residents from taking advantage of the fact that a company has a foreign charter. Here, Texans are asserting a claim against a Texas company under the Texas Workmen's Compensation Law and are in the position of urging that they should be in federal court because Texas courts will not give them a fair shake. This is no case for federal courts." 279 F. 2d at 554.

The basic principle on which diversity jurisdiction is grounded is the fear that the local court might favor its own citizens over those of another state. Plaintiff, a local corporation, cannot invoke diversity jurisdiction which would be denied a foreign corporation with its principal place of business within the state.

Plaintiff contends further that the most recent decision of the Southern District of New York, Chu v. Plastic Systems Corporation, supra, supports plaintiff's contention that the "nerve center" or "home office" test is applicable to a corporation where its actual business operations occur in one state, but the policy decisions are determined and overall control exercised in another state. While Chu does lend some support to plaintiff's position it is distinguishable on the facts. In Chu the parent corporation, ISC, had its principal office in New York. The subsidiary corporation PSC, had been organized initially under another name in Pennsylvania. When acquired by the parent corporation, the name was changed, and the corporation qualified to do business in New Jersey. At the time the parent corporation acquired PSC it already owned IPC, which was based in New Jersey. The function of PSC was "the manufacture, sale and distribution of plastic sheets." The manufacturing activities were "predominantly in Pennsylvania", although it did use the manufacturing facilities of IPC in New Jersey to make certain samples. All of "PSC's sales to IPC and the trade and all of PSC's advertising and promotional activities" were in New Jersey.

Under these facts the court held that "New Jersey may properly be deemed the 'nerve center' of this corporation whose sales operations increased from a mere $500,000 in 1967 to over $10,000,000 in two years." While the court attached more importance to the situs of overall policy decisions and control than many of the cases construing section 1332(c), it is clear that substantial day-to-day operations were conducted in New Jersey as well as in Pennsylvania —a situation which does not obtain in the instant case.[20]

Inland and Spector are factually similar to the instant case and set forth the test which should be followed. Another case involving comparable facts is

---

20. Moreover, each of the four cases from the Southern District of New York was *decided by a different judge. Particularly* in view of the different factual situations, it cannot be said that Chu more than the others represents the position of the *Southern District of New York.*

Southland Mall, Inc. v. Garner, W.D. Tenn.1968, 293 F.Supp. 1370, where both the parent and wholly owned subsidiary were Maryland corporations. The subsidiary operated a shopping center in Tennessee. In holding that Tennessee was its principal place of business the court said:

> "Plaintiff, as stated, is a Maryland corporation and it owns and operates a large shopping center in Shelby County in a suburb near Memphis. It is a wholly owned subsidiary of a Maryland parent corporation, which owns the stock of several such subsidiary corporations each of which owns and operates a shopping center. Plaintiff's shopping center here is its only source of revenue. Its resident manager and his secretary, its superintendent, all but possibly two of its eight janitorial employees, and its three nightwatchmen live here. All of its tangible property is located here. At the time suit was filed, all of those employees except the resident manager were paid from a payroll account maintained at a local bank. Broad policy is made by the officers, all of whom live in Maryland; and the general manager, who also has such responsibility for two other shopping centers, lives there but comes here about once a month in carrying out his duties. Rent is paid by tenants to the Maryland office. The officers in Maryland have overall responsibility for leasing and sign the leases, but the resident manager handles details of leasing. Invoices for expenses are sent to Maryland for payment.

> "We conclude that the principal place of business of plaintiff is in

Tennessee and that therefore we have no diversity jurisdiction." 293 F. Supp. at 1372.[21]

In oral argument counsel for plaintiff relied primarily upon Chu v. Plastic Systems Corporation, supra, and Unger v. Del E. Webb Corp., N.D.Cal.1964, 233 F.Supp. 713, contending that they are the latest and most persuasive authority. Unger, like Chu, is clearly distinguishable. Judge Carter found in Unger that the "nerve center", "center of corporate gravity" and "center of corporate activity" tests are articulations of the same concept. I agree. It is true also that many of the functions performed by Del E. Webb Corporation at its home office in Phoenix, Arizona, were the same as those performed by defendant's parent corporation at its home office in New York. Any similarity between the two cases ends at that point. Del E. Webb Corporation was an Arizona corporation "with substantial activities among several states." Plaintiff there contended that California was "a" principal place of business within the meaning of section 1332(c) as amended. Judge Carter properly held that there could be only one principal place of business and that under any test or standard of measurement in the cases there cited the corporation could not have its principal place of business in California. The record disclosed, inter alia, that the defendant's home offices were in a "large company owned building in Phoenix." It had a total of 524 employees—215 in Arizona, 98 in California, and the remainder divided among four other states. The net income derived in California was 23.8 per cent of the total income of the defendant. Obviously there was no basis

21. The "nerve center" theory has been rejected in many other cases where a corporation or subsidiary of a parent corporation is engaged in business in only one state, including Knee v. Chemical Leaman Tank Lines, Inc., E.D.Pa.1968, 293 F.Supp. 1094; Bruner v. Marjec, Inc., W.D.Va.1966, 250 F.Supp. 426; Spector v. Rex Sierra Gold Corp., S.D.N.Y.1964, 227 F.Supp. 550; Epstein v. Guilford Industries, Inc., S.D.N.Y.1963, 218 F.Supp. 286; Hodges v. Georgia Kaolin Co., M.D. Ga.1962, 207 F.Supp. 374; Charles Keeshin, Inc. v. Farmers & Merchants Bank of Rodgers, W.D.Ark.1961, 199 F.Supp. 478; and Mattson v. Cuyuna Ore Co., D.Minn.1960, 180 F.Supp. 743.

under these facts for holding that California was the principal place of business. By reason of the different factual situation, Unger affords no support for plaintiff's position in this case.

■ Under the facts as herein set forth I conclude that California is the defendant's principal place of business within the meaning of section 1332(c) as amended. Of particular significance are the facts that (1) defendant qualified to do business in California four days after it was incorporated in Delaware and has not qualified to do business in New York or any other state; (2) its sole business is the operation of one hotel in San Francisco, and all of its revenue is derived from the operation of that hotel and the lease of commercial property within the hotel; (3) it owns no other property; (4) it pays taxes in California and not in any other state; (5) over 95 per cent of its employees are in California and approximately 93 per cent of its operating expenses are incurred there; and (6) the day to day activities are directed by the hotel management in San Francisco.

In my opinion these factors clearly establish California as the "place of operations" or place of "day-to-day activities". They outweigh the activities and formulation of overall policy in the home office of the parent corporation upon which plaintiff relies in urging that under the "nerve center" or "home office" test New York is defendant's principal place of business.

■ In view of my conclusion that California is the principal place of business of the defendant corporation, the requisite diversity of citizenship is lacking, and defendant's motion to dismiss must be granted.

It is ordered that defendant's motion to dismiss for lack of jurisdiction is granted.