Arthur R. ROSO, Individually and as Representative of all those persons similarly situated, Plaintiff,

v.

SAXON ENERGY CORPORATION, et al., Defendants.

No. 85 Civ. 6131 (KTD).

United States District Court, S.D. New York.

Jan. 10, 1991.

Coughlin & Gerhart (Peter H. Bouman, of counsel), Binghamton, N.Y., for plaintiff.

Standard, Weisberg, Heckerling & Rosow, P.C. (Arthur Liederman, of counsel), New York City, for defendant, Sheldon Barr.

Bergadano, Zichello & Babchik (Jack Babchik, of counsel), New York City, for defendant, Kenneth Falk.

A. Martin Stuchiner, New York City, for defendants Braunfeld and Saxon.

Graham & James, New York City, for defendant Raymond Kenard.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiff Arthur Roso, Individually, and as Representative of all those persons similarly situated ("Roso"), was certified by this Court on December 6, 1988 to bring this action against Saxon Energy Corporation ("Saxon") *et al.* on behalf of the designated class for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, the Securities Act of 1933 ('33 Act), 15 U.S.C. § 77$l$ (2) (1981), and the Security Exchange Act of 1934 ('34 Act), 15 U.S.C. § 78j(b) (1981). In addition, the complaint alleges causes of action for fraud, breach of contract, negligence, and negligent misrepresentation. Roso moves pursuant to Fed.R.Civ.P. 56 for summary judgment against defendant

Sheldon Barr on the first and second causes of action for fraud and RICO violations. In addition, Roso moves pursuant to Fed.R.Civ.P. 64 and N.Y.Civ.P.Law & R. 6201(3) for an order of attachment to protect certain money in Swiss bank accounts within Barr's control from being dissipated by him. Barr cross-moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the entire action against him individually, or in the alternative, staying the action, or granting summary judgment dismissing Roso's RICO cause of action.

### FACTS

This civil action arises out of a scheme whereby members of the class were induced to invest in leases for energy saving devices referred to as "Energy Brains." These Energy Brains were apparently designed to work in tandem with heating and air conditioning units in order to promote energy efficiency for large commercial spaces and buildings.[1] Three corporations, Saxon, Enersonics Inc., ("Enersonics"), and ALH Energy Management Corporation ("ALH") participated in the Energy Brain Leasing Program. Saxon is self-described as a "closely held leasing company specializing in energy conservation equipment." Bouman Affid., Exh. 7. Enersonics manufactures the Energy Brain units. Bouman Affid., Exh. 7. ALH were the managers of the Energy Brain, entering into service agreements with class members. Bouman Affid., Exh. 3, p. 235; Exh. 1, p. 24. In addition, Sheldon Barr, Leonard Freedman, Kamal Fereg, Charles Taylor, and Frank Leha individually and together held different posts at the various companies and participated in the Energy Brain Leasing Program. *See* Bouman Affid., Exh. 2, p. 2. Barr was identified to be both the secretary of Enersonics and Saxon's corporate legal counsel. Tr. 4378, 4527.

Members of the class at bar were apparently encouraged to lease the Energy Brain devices in order to obtain tax advantages and credit. Status as a lessee was purportedly crucial because tax deductions were not available to passive investors whereas owners of businesses for profit were afforded deductions. *See* Bouman Affid., Exh. 6. Class members were told that as lessees, they would be considered business owners and not security holders, which connotes a passive investment. *See* Bouman Affid., Exhs. 5–10. Furthermore, the promotion materials stated that the lease would likely not be construed as a security.

Investors in the Energy Brains were provided promotional materials containing projections of tax credits and tax deductions. Bouman Affid., Exh. 7. Between credits and deductions, it was estimated that lessees could get a tremendous return on their investments. The materials specifically stated that for every dollar invested, three dollars could be deducted and/or credited to taxes so that under the scheme, as delineated in the promotional materials, only the "government loses".

The tax scheme was a sophisticated one which required a vertical structure in order to gain the tax advantages. Enersonics, the manufacturer, was at the top. Saxon was the intermediary or lessor; it paid a minimal sum for the purchase of the Energy Brains and then backed its purchases with promissory notes for the remainder owed. Each installed "Brain" was supposed to provide sufficient rental funds to pay off the promissory note between Saxon and Enersonics and further provide a profit to the investor lessees. Saxon also functioned as a conduit whereby the tax credits were to pass through it to the advantage of the lessees at the bottom. An arms-length relationship between Saxon and Enersonics was crucial in order for the tax shelter to be legal, meaning that it was mandatory for Saxon's interests in the scheme to be wholly separate from Enersonic's interests.

Due to the suspect nature of the scheme, a civil action was commenced in this Court

---

1. Saxon's promotional materials describe the Energy Brain as: "a sophisticated, highly comprehensive computer, which is specifically programmed to transmit energy saving directives to the energy consuming equipment being utilized. The unit controls and monitors energy input for heating, air conditioning, and electrical usage. The "Energy Brain" is trademarked and patents have been applied for." Bouman Affid., Exh. 7.

on August 7, 1985. On April 29, 1986, Barr was indicted in the Supreme Court of the State of New York County of New York for one count of Conspiracy in the Fifth Degree, one count of Scheme to Defraud in the First Degree, and 122 counts of Grand Larceny in the Second Degree. On April 30, 1987, Barr was tried and found guilty of one count of Scheme to Defraud in the First Degree and nine counts of Grand Larceny in the Second Degree. Supreme Court Justice A.K. Bradley sentenced Barr to an indeterminate period of imprisonment not to exceed three years on the Scheme to Defraud in the First Degree count. On four counts of Grand Larceny in the Second Degree, he was sentenced to a minimum of two years and a maximum of six years. For five other counts of Grand Larceny in the Second Degree, he was sentenced to a minimum of two years with a maximum of six years. Counts five-to-ten were to run concurrently with each other but consecutively with counts one-to-five. Restitution was set in the amount of $13,-200,000. Bouman Affid., Exh. 4. The remaining defendants plead to various counts of fraud and larceny.

## DISCUSSION

■ Roso moves for summary judgment on the theory of issue preclusion, contending that the requisite elements for both common law fraud and RICO violations were essentially proven beyond a reasonable doubt at the state level. The doctrine of collateral estoppel, which is intended to reduce litigation and conserve judicial resources, is predicated upon the general notion that a party should not be permitted to relitigate an issue that has previously been decided. *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985). It is well settled that a criminal conviction, whether by jury verdict or guilty plea, estops a convicted defendant from raising factual issues decided in the criminal proceeding in a subsequent civil lawsuit. In fact, "in the case of a criminal conviction based upon a jury verdict of guilty, issues that were essential to the verdict must be regarded as determined by the judgment." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534, *reh. denied,* 341 U.S. 906, 71 S.Ct. 610, 95 L.Ed. 1345 (1951).

### 1. *Fraud*

■ The plaintiff seeking the benefit of collaterally estopping the defendant from asserting the same claim a second time in a different forum has the burden of demonstrating the identity of the issues in the present civil litigation. *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984). Each and every element of the claim at bar must have been proven in the state forum to the satisfaction of Roso's burden. Roso maintains that the same elements proven beyond a reasonable doubt in Barr's conviction on scheme to defraud and grand larceny grounds, are equivalent to that which must be proven for common law fraud. I agree.

During trial, Judge Bradley instructed the jury that in order to find Barr guilty of the crime of Scheme to Defraud in the First Degree in violation of New York State Penal Law § 190.65,[2] they must find, beyond a reasonable doubt, that Barr had committed the following three separate elements:

1. That from on or about April 7, 1981 to on or about March 24, 1986 in the County of New York and elsewhere the defendant obtained property.

---

**2.** Section 190.65, in pertinent part, states:
   1. A person is guilty of a scheme to defraud in the first degree when he: (a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representations or promises, and so obtains property from one or more of such persons; or (b) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons.

2. That the defendant obtained such property by engaging in a scheme constituting a systematic on going [sic] course of conduct.

3. That the defendant *intended to obtain* property from ten or more persons *by false or fraudulent pretenses, representations, and promises.*

Criminal Trial Transcript ("Tr.") 4997 (emphasis added).

Furthermore, regarding Barr's conviction on Grand Larceny grounds, the Judge instructed the jury that a person is guilty of grand larceny in the second degree when he steals property and when the value of the property exceeds one thousand five hundred dollars. Tr. 5004. Specifically, the jury was told: "A person steals property and commits a larceny when with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." Tr. 5004. The judge further charged the jury that they could convict only if they found:

1. That on the period from May 1, 1982 through on or about April 20, 1983 in the County of New York and else where [sic] the defendant obtained property . . . the value of which exceeded fifteen hundred dollars, to wit, ten thousand dollars.

2. That the defendant *obtained the property by making a false and fraudulent representation of a past or present fact.*

3. That the *defendant knew those representations were false.* As I explained earlier, a person knowingly makes a false representation when the evidence shows that he knew when he made the statement or representation that it was untrue. . . .

4. That the *defendant made the false representations with the intent of depriving an owner of property.*

Tr. 5004–007 (emphasis added).

In addition, the prosecution was required on both charges to disprove, beyond a reasonable doubt, "that the defendant [Sheldon Barr] was acting in good faith as I have previously defined." Tr. 4998–999, 5006.

On April 30, 1987, Barr was found guilty as set out above, thus compelling the conclusion that the above elements were proven beyond a reasonable doubt.

█ A claim of common law fraud is met when the following elements are proven: "(1) a material, false representation; (2) an intent to defraud thereby; (3) reasonable reliance on the representation; and (4) damage to the plaintiff." *Wanamaker v. Columbian Rope Co.*, 740 F.Supp. 127, 141 (N.D.N.Y.1990) (citing *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966 (2d Cir.1987)). Specifically:

To prevail on a claim for common law fraud, the plaintiff must prove that the defendant made a false representation of fact, that the defendant made the representation with scienter, that the defendant intended the plaintiff to act or to refrain from acting in reliance on the misrepresentation, that the plaintiff justifiably relied upon the misrepresentation in taking . . . action and that the plaintiff sustained pecuniary loss as a result of this reliance.

*First City Nat. Bank & Trust Co. v. Federal Deposit Ins. Co.*, 730 F.Supp. 501, 513–14 (E.D.N.Y.1990) (quoting *Aeronca, Inc. v. Gorin*, 561 F.Supp. 370, 372 (S.D.N.Y.1983)).

█ In order to collaterally estop Barr from being able to further litigate the issue of common law fraud, the elements proven by the state which lead to Barr's criminal conviction must be similar enough to prove civil common law fraud. The Energy Brain promotion is replete with false representations made by Barr as principal of the fraudulent scheme. An example of the material misrepresentations promulgated by the scheme was that the Energy Brains were purported to have been purchased by Saxon in an arms-length agreement for prices equivalent to values derived from independent appraisals. Tr. 232.

At trial, Barr was identified to be a key participant and/or principal in both bargaining corporations, Enersonics and Saxon. Tr. 4378, 4447, 4537. Contemporane-

ously, Barr acted as corporate legal counsel for Saxon while holding the office of Secretary at Enersonics. Tr. 4527. With regard to the purchase and sale of Energy Brains, Barr held integral positions on both sides of the agreement and he thus could not be considered at arms-length to Enersonics at the time Saxon purchased the Energy Brains.

Furthermore, the Energy Brain promotion was dependent upon the objective independent appraisals determining the fair market value of the device. The promotional materials outlined the bargaining parties, their respective positions in the agreement, requisite appraisals, and valuations. The materials further falsely stated that valuations were projected on the basis of independent appraisals. Projected tax credits and deductions were directly linked to the values attributed the Energy Brains.

At the criminal trial, the appraisals were determined to have been fraudulent. Barr himself admitted to rendering the appraisals on at least two occasions, thus evidencing that the appraisals were not independently rendered. Tr. 4372, 4382. Moreover, the appraisals were grossly in excess of the device's true fair market value. The Energy Brain was valued at $80,000 in the promotional materials where an equivalent competitor model was determined to be worth less than $800.

I find that fair valuation was important and material because, under the 1982 tax code, tax credits and deductions were allowed to pass through Saxon to investors based upon the fair market value of the Energy Brain as determined by purportedly independent appraisals in connection with arms-length sales. Misrepresentations made by Barr in connection with entering an arms-length agreement and regarding independent appraisals also proved material to the amount of tax deductions and credits projected to investors. As such, investors relied heavily on the appraisals and the validity of independent appraisals. Barr knew that the information was false, yet he promulgated and disseminated the misrepresentations to all parties who eventually invested in the scheme and

who were proximately injured thereby. The Energy Brain promotion was a fabrication intended to create tax benefits for the investors as long as the exorbitant valuations of the devices went unchallenged.

Finally, it was proven beyond a reasonable doubt that Barr had the requisite intent to deceive because the very same intent was also a requisite element in both his convictions of Scheme to Defraud in the First Degree and Grand Larceny in the Second Degree. In fact, the record indicates that Barr conceived the entire scheme. Bouman Affid., Exh. 3, p. 252–54. Consequently, every common law fraud element was proven in Barr's previous criminal convictions sufficient to apply the doctrine of collateral estoppel, precluding Barr from further litigating the issue of fraud in this civil case.

### 2. *RICO*

■ Count two of Roso's civil complaint charges Barr with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. RICO provides a private right of action to "any person injured in business or property by reason of a violation of the statute." 18 U.S.C. § 1964(c). To state a civil claim for damages under RICO, the plaintiff must at the outset, allege that the defendant has violated one of the substantive provisions of the RICO statute, commonly known as "criminal RICO." *See* 18 U.S.C. § 1962 (1976). Section 1962(c), in pertinent part, states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*First City Nat. Bank & Trust Co. v. Federal Deposit Ins. Co.*, 730 F.Supp. 501, 507 (E.D.N.Y.1990) (quoting 18 U.S.C. § 1962(c) (1976)).

By alleging a violation of § 1962(c), the class must allege an economic injury by

virtue of the predicate acts having been consummated. Mail fraud is considered a predicate act. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Under the provisions for proving civil RICO violations, the plaintiffs must show that the defendant committed two or more acts constituting a "pattern" of "racketeering activity" and directly or indirectly participated in an enterprise the activities of which affect interstate commerce. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub. nom., Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

A simple scheme to defraud is not an act indictable under RICO. Although the offense of mail fraud has its genesis in scheme to defraud, the gist of the crime lies in the use of the mails in executing the scheme. *United States v. Weatherspoon,* 581 F.2d 595 (7th Cir.1978). In order to prove mail fraud pursuant to 18 U.S.C. § 1341 (1982), it must be proven that the fraud was accomplished by the use of the mails. To convict under the section for securities law violations, it must be shown that the item sold was a security and that the fraud was accomplished by the means of interstate commerce or the mails. Further, 18 U.S.C. § 1962(b) requires that the enterprise be engaged in, or its activities affect, interstate or foreign commerce. Roso fails to show in what respect Barr was found guilty of mail fraud or securities fraud in the sales of the Energy Brains.

Specifically, whether the fraud was accomplished by the use of the mails or by means of interstate commerce, or if the enterprise or its activities were engaged in or affected interstate or foreign commerce were never elements submitted to the jury in state court. As a consequence, Barr contends that the requisite elements for a RICO conviction could not have possibly been found by the jury. *See Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984) (party attempting to defeat collateral estoppel has the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior action.) I find that Barr was not afforded a full and fair opportunity to litigate the predicate acts underlying the RICO cause of action because use of the federal jurisdictional means to affect the fraud is not inherent to a guilty verdict on a criminal scheme to defraud. Thus, Barr cannot be collaterally estopped at this juncture from litigating and defending himself against the instant RICO cause of action.

### 3. *Attachment of Assets*

■ Finally, Roso moves for an order of seizure in order to secure property for the "purpose of securing satisfaction of the judgment ultimately to be entered in the action." Fed.R.Civ.P. 64.[3] Under New York State law, grounds for attachment are adduced where the plaintiff has demanded and would be entitled to a money judgment and when the defendant, with the intent to frustrate the enforcement of the judgment that might be rendered in the plaintiff's favor, "secreted property" or "removed property from the state." N.Y. Civ.P.Law & R. 6201. The record at bar indicates that Barr removed money to Swiss bank accounts. Although the Swiss government apparently froze Barr's assets, if the freeze is lifted there is no indication that the sources of funds will be protected. The investor class would then be left without a remedy because there might be no source of funds on which to execute the judgment. As such, permitting attachment of Barr's Swiss bank accounts is proper and warranted at this juncture.

For the foregoing reasons, Roso's motion for summary judgment against defendant Sheldon Barr is granted on the first cause of action for fraud but denied on the second cause of action for RICO violations. Barr is collaterally estopped from further litigating only the common law fraud issue. Barr's cross-motion for summary judgment dismissing the entire action against him

---

**3.** In addition, Roso requests that the Court grant an injunction requiring Barr to cooperate and assist in return of the funds currently frozen in his Swiss bank accounts. Because the attachment cannot be effected without this, the requested injunction will be granted.

individually, or in the alternative, staying the action, or granting summary judgment dismissing Roso's RICO cause of action is denied. Roso is hereby ordered to submit judgment on the first cause of action within ten days of the date of this order. This matter will then be referred to a magistrate for an inquest on damages regarding Barr's fraud. As such, Roso's motion pursuant to Fed.R.Civ.P. 64 and N.Y.Civ. P.Law & R. 6201(3) for an order of attachment and implementing injunction is granted.

SO ORDERED.