### DANBURY BOWLARAMA CORP., Plaintiff,

v.

### RCA CORPORATION et al., Defendants.

### No. 76 CIV. 625 (MP).

United States District Court,
S. D. New York.

May 13, 1976.

Milberg & Weiss, New York City, for plaintiff; by David J. Bershad, Sharon Levine Mirsky, and Paul L. Tullman, New York City.

Cahill, Gordon & Reindel, New York City, for defendant (RCA Corp.); by Lawrence J. McKay, Robert T. Quinn and Joel E. Davidson, New York City.

### MEMORANDUM

POLLACK, District Judge.

Defendant RCA Corporation in this contract action asserting non-federal claims moves for dismissal of the complaint for lack of subject matter jurisdiction on the ground that the requisite diversity of citizenship is lacking.[1] On the facts adduced as shown hereafter, the motion must be granted.

Plaintiff sues for rescission of a sale of an automatic bowling scorer installed in a Danbury, Connecticut bowling center. De-

1. Defendant RCA also moves for dismissal of several counts of the complaint for failure to state a claim under state contract law. However, consideration of this challenge has been deferred in light of the resolution of the question as to subject matter jurisdiction.

fendants, the seller under the contract (Rapid Score, Inc.), the seller's parent (Conbow Corp.), and the assignee of the contract (RCA Corp.), are three corporations either incorporated or doing their principal business in New York. RCA contends that, while plaintiff, the purchaser of the bowling equipment, is incorporated in Connecticut, its principal place of business is New York.

Diversity jurisdiction is conferred on the federal courts when a suit involves citizens of different states and involves the requisite amount in controversy, and "[a] corporation [party] shall be deemed a citizen . . . of the State where it has its principal place of business . . . ." 28 U.S.C. § 1332(c).

The burden of establishing jurisdiction is on the party who seeks the exercise of that jurisdiction, namely the plaintiff herein. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951, 955 (1942); *Quaker State Dyeing & Finish Co. v. ITT Terryphone Corp.,* 461 F.2d 1140 (3d Cir. 1972).

On this motion the issue is whether the plaintiff corporation has its principal place of business at its president's Port Chester, New York office, as indicated by all the corporate documents, or at the bowling center in Danbury, Connecticut, where its vice-president has a desk and he and the corporation's only other employee spend a third of their week.

The contract of sale involved in the suit lists the plaintiff corporation at a Port Chester, New York address. It was executed by Andrew Benerofe, Danbury Bowlarama Corporation's president and one of its directors, and a representative of Rapid Score in New York on January 17, 1974. In June of that year the equipment sold under the contract, a scorer, was installed in the Danbury bowling center and, according to the allegations of the complaint, began to malfunction shortly thereafter.

Defendant RCA, the assignee of the contract, claims to have serviced the scorer as required under the contract's warranty provisions, but such services were not apparently to plaintiff's satisfaction. Counsel for plaintiff sent a letter to all the defendants herein on December 29, 1975 purporting to revoke acceptance of and to tender back the scorer. This action for rescission, return of the contract price and consequential damages was filed in this Court in January of 1976.

Danbury Bowlarama Corporation leases a bowling and billiard center in Danbury, Connecticut. The only business of this corporation is to collect fees under a sub-lease or franchise agreement with Louis Spano and Ed Loughlin, the center's operators. The arrangement between plaintiff and Spano and Loughlin (who are doing business under the name "Danbury Bowlarama" but are not parties in this action) is that in addition to the sub-lease the plaintiff provides promotional and general business guidance through its vice-president, Bernard O'Kane, and provides a master mechanic, Joseph DiPasquale, in return for a fee or a rental based on the number of lines that are bowled.

O'Kane and DiPasquale, Danbury's only salaried employees, split their working week between the Danbury bowling center and three other centers run by three different corporations. Benerofe estimates that each visits the Danbury center at least three times a week and spends roughly a third of their working time there. O'Kane keeps a desk in an office at the Danbury bowling center which he shares with Spano and one of Spano's employees. However, he travels to Benerofe's New York office for at least two-thirds of the weekly meetings between these two officers. The remainder of these weekly meetings are held either in Danbury or at one of the other three bowling centers for which O'Kane is responsible.

Benerofe is the chief officer of the corporation and his office in New York is listed in the corporate by-laws as the principal office. It is from that office that Benerofe directs the activities of O'Kane and DiPasquale, both by telephone to O'Kane and in

most of the face-to-face meetings with O'Kane. While Benerofe asserts that he spends only two hours a week on Danbury Bowlarama Corporation matters, it is clear that his office is the focal point of the corporation's business affairs. The address of that office is listed on the corporation's federal and Connecticut corporate tax returns and the corporation's federal return was sent to the Internal Revenue Service office that handles Westchester County, New York, returns. The corporate records are all kept in New York and the corporation's accountants and lawyers do their business with that office. There have been no formal corporate minutes since 1966 when a meeting was recorded as held in New York for the election of officers.

It is from the New York office that Benerofe controls the plaintiff corporation's finances. He signs about 75% of the corporation's checks (leaving the remainder to be signed by O'Kane generally as a matter of Benerofe's convenience) and the bank statements from the corporation's two bank accounts, in Port Chester and Danbury, are directed to him at Port Chester. The bookkeeping for the corporation is done by a bookkeeper employed by Benerofe Construction who works in the New York office. (The plaintiff corporation pays Benerofe Construction for the use of its bookkeeper.) The address on the contract at issue here is that of the New York office and the letters concerning that contract that have been submitted to the Court, with only one exception, bear either the New York address or the address of plaintiff's New York counsel.[2]

In addition, three of the four directors and three of the four officers of the plaintiff corporation are residents of New York.

Shortly after the passage of the amendment to 28 U.S.C. § 1332(c) that provided that a corporation is to be deemed a citizen of the state in which it has its principal place of business, Judge Weinfeld of this District declared that

> [t]he issue [regarding the location of its principal place of business] must be resolved on an over-all basis. It is governed by the totality of corporate activity at a given place, which, to borrow a phrase from another area of law, may be said to represent the 'center of gravity' of corporate function. . . .

> Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the *nerve center* from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959) [emphasis added].

While it is true that this corporation is not "far-flung" and that it boasts but one "constituent part" (namely, the bowling center itself), there is no doubt that its nerve center is the New York office. This conclusion is not undermined by the fact that Benerofe and O'Kane conduct occasional

**2.** Defendant points particularly to a letter from Benerofe to the Credit Manager of Rapid Score dated September 19, 1975 which addressed the problem of how to handle the sales tax on the contract at issue in this case. In that letter Benerofe stated "The interpretation of the sales tax requirement that we now have is that since the equipment was purchased in the State of New York by a company whose principal place of business is in New York, it is within the jurisdiction of the New York State Sales Tax Law."

Though Danbury Bowlarama was named as the purchaser in the contract, Benerofe now claims that the actual purchaser, the company referred to in the letter, was a joint venture made up of New York residents and called Scoring Equipment Danbury. Plaintiff alleges that it was and is simply acting as the nominee for this joint venture.

It is clear under Rules 17(a) and 19, Fed.R. Civ.P., and 28 U.S.C. § 1332 that a court may not ordinarily disregard the citizenship of the "real party in interest" or an "indispensable" party. *See* Wright, Miller, Cooper, *Federal Practice and Procedure,* § 3606 at 624–8 (1975). While the Court cannot say on the basis of the record presently before it that this joint venture fits either description, the involvement of this New York entity in the contract does present another New York contact to support the Court's conclusion that, at the very least, the plaintiff will not be prejudiced by being obliged to resort to its state court remedies.

meetings in Connecticut, or by a comparison of the relative amounts of time spent on the corporation's business. The fact remains that, while O'Kane is advising Spano and Loughlin, Benerofe is overseeing and directing O'Kane and the plaintiff corporation's finances from New York.

However, plaintiff contends that the Court should look to the locus of the corporation's physical operations rather than its nerve center in deciding this motion: i. e., it should determine which "state contains a substantial predominance of corporate operations, including personnel . . . ." *Inland Rubber Corp. v. Triple A Tire Service, Inc.,* 220 F.Supp. 490, 496 (S.D.N.Y.1963); *see Kelly v. United States Steel Corp.,* 284 F.2d 850 (3d Cir. 1960) (where the Court held that the center of a corporation's production or service activities, rather than its policymaking, determines its principal place of business); *Leve v. General Motors Corp.,* 246 F.Supp. 761, 764 (S.D.N.Y.1965).

In *Egan v. American Airlines, Inc.,* 324 F.2d 565, 566 (2d Cir. 1963), a case that was decided after *Inland, supra,* and that distinguished *Kelly, supra,* on the grounds that "in that case over-all management control was split between New York and Pennsylvania," the Court of Appeals for this Circuit declared that there is no conflict between the decisions in *Scot, supra,* and *Kelly, supra.* It opted for a consolidated test, holding that the principal place of a corporation's business is that state in which it formulates its " 'general over-all management and business policy' " and in which it "conducts a substantial [but not necessarily the majority of its] business." *Egan, supra,* at 565–6.[3]

More recently, when faced with a choice between the so-called nerve center and physical operations tests, Judge Lasker of this Court pronounced the former test the favored one in this District and distinguished *Leve, supra,* as a case in which the Court "found that only 'occasional high lev-

el policy decisions' were made in New York with the bulk of policy functions, as well as manufacturing operations, concentrated in Michigan." *Philip Morris, Inc. v. Sun Leasing Co.,* 371 F.Supp. 1233, 1234 (S.D.N.Y. 1974).

Whether the nerve center test is to be favored in all cases, that test, as it is explained in *Egan,* is the test most appropriate to the facts of this case. The physical operations or locus of services test is simply not an accurate measure of corporate activity when the actual physical or service-oriented operations of the corporation are as limited as those of the plaintiff. The usual corporate managerial tasks make up a far greater percentage of plaintiff's operations than is the case with a corporation that makes a product or provides a service as its main function. The main function of this corporation is to sub-lease a bowling center to another company, and management of plaintiff's own affairs is itself a substantial part of plaintiff's operations. The management and operation of the bowling center, on the other hand, is left to Spano and Loughlin, who receive only advice, consultation and some maintenance help from plaintiff.

Applying the test articulated in *Egan, supra,* the Court finds that New York is both the locus of the corporation's management and policy-making and the locus of a substantial portion of the plaintiff corporation's operations. Whatever the test applied, it is clear that the principal part of the corporation's overall functions is performed in New York.

Accordingly, since the principal place of the corporate plaintiff's business is New York and the defendants are likewise citizens of New York, the requisite diversity jurisdiction is lacking in this case.

Complaint dismissed, without prejudice to the merits.

SO ORDERED.

---

3. The Court in *Egan, supra,* at 566, also observed that "the act [amending 28 U.S.C. § 1332(c) to include the principal place of business standard] was intended to reduce substantially the caseload of the federal District Courts based on diversity."