PINNACLE CONSULTANTS, LTD., on Behalf of SHAREHOLDERS OF LEUCADIA NATIONAL CORPORATION, Plaintiff,

v.

LEUCADIA NATIONAL CORPORATION, Ian M. Cumming, Joseph S. Steinberg, Paul M. Dougan, Lawrence D. Glaubinger, Melvin L. Hirsch, James E. Jordan, Jr., John W. Jordan II and Jesse Clyde Nichols III, Individually and as Officers and Directors of Leucadia National Corp., Defendants.

No. 94 CIV. 3496(SS).

United States District Court, S.D. New York.

Nov. 13, 1995.

Tanner Propp & Farber, New York City (Lester J. Tanner, of counsel), for Plaintiff.

Weil, Gotshal & Manges, New York City (Dennis J. Block, of counsel), for Defendants Ian M. Cumming, Joseph S. Steinberg, Paul M. Dougan, Lawrence D. Glaubinger, Melvin L. Hirsch, James E. Jordan, John W. Jordan II and Jesse Clyde Nichols III.

Pavelic & Levites, P.C., New York City (Richard Cashman, of counsel), for Defendant Leucadia National Corporation.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendants move to dismiss the Complaint on numerous grounds, including failure to state a claim under Fed.R.Civ.P. 12(b)(6) and lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1). For the reasons discussed below, defendants' motion is **GRANTED** in part and **DENIED** in part.

### BACKGROUND

For the purposes of this motion, the facts alleged in the Complaint will be taken as true. The plaintiff, Pinnacle Consultants, Ltd., is incorporated in Delaware and is a minority shareholder in defendant Leucadia National Corporation. The eight moving defendants (the "Defendants") are officers and directors of Leucadia.[1] Defendant Leucadia is a financial services corporation based in New York.[2]

---

**1.** Defendant Melvin L. Hirsch is a former director.

**2.** Leucadia has also filed a motion to dismiss, relying on the same memorandum of law that is before me on this motion.

This shareholder derivative action claims that defendants defrauded Leucadia over a seven-year period by executing a series of illegal stock maneuvers. The alleged purpose of this scheme was to enrich defendants Cumming and Steinberg, the company's Chairman and President respectively, and to allow the two men to seize control of the corporation. The Complaint asserts that defendants violated two New York laws and mailed false and misleading proxy statement which concealed the lawbreaking from shareholders, thereby securing shareholder approval for stock transactions that were illegal. Alternatively, the Complaint maintains that even if the stock transactions were not void as a matter of law, they were void as not being in the company's best interest. The Complaint asserts injury to the company of more than $50 million.

Plaintiff claims federal jurisdiction under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and under § 14(a) of the Securities Exchange Act ("Exchange Act"). Alternatively, plaintiff claims that jurisdiction exists on diversity grounds, asserting common law claims of corporate waste, conversion, breach of fiduciary duty, and fraud. The alleged predicate acts under the RICO counts are four instances of mail fraud and wire fraud between 1985 and 1992, each act consisting of the mailing of an annual proxy statement to shareholders. As to three of the proxy statements, the fraud allegedly stemmed from the issuance of stock options ("warrants") to Cumming and Steinberg. As to the fourth proxy statement, the fraud allegedly stemmed from defendants' misrepresentations about a proposed merger between Leucadia and a related corporation.

In this motion to dismiss, defendants contend that plaintiff's causes of action, in whole or in part, exceed the statute of limitations, fail to state a claim, and lack subject matter jurisdiction.[3] I will address each of these issues in turn.

---

**3.** Defendants also urge dismissal on other grounds. Defendants maintain that, pursuant to Fed.R.Civ.P. 23.1, plaintiff cannot adequately represent the interests of the shareholders and that plaintiff has failed to make the required pre-litigation demand on the corporation. I dis-

## DISCUSSION

### I. Statute of Limitations

Plaintiff concedes that its Exchange Act claim is barred by the relevant statute of limitations. (Pl's.Mem. in Opp. to Def's. Motion to Dismiss at 3.) Thus, the only federal claims remaining are those asserted under RICO. Defendants assert a statute of limitations defense to two of the four predicate acts that form the basis of plaintiff's RICO claims. Although I find in Part II *infra* that no valid RICO predicate acts exist as a matter of law, it is appropriate to establish first why the statute of limitations challenge fails.

■ Civil RICO actions are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The instant Complaint was filed on May 11, 1994. Hence, plaintiff may assert all claims that accrued on or after May 11, 1990. Two of the RICO predicate acts are indeed time-barred: the proxy statement mailed in June, 1985,[4] and the comparable mailing in May, 1990, which occurred before the shareholders' meeting of May 11. However, this does not end the inquiry. Plaintiff contends that these two predicate acts generated a total of three subsequent injuries, which are not time-barred because they accrued within the limitations period. For the purposes of this motion I find that two of the three asserted injuries survive the limitations challenge.

In *Malley–Duff*, the Supreme Court deliberately left open the question of when a civil RICO action accrues. *Id.* at 156, 107 S.Ct. at 2767. In *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989), the Second Circuit adopted a "rule of separate accrual" for civil RICO injuries. *Bankers Trust*, 859 F.2d at 1104. Under this rule, each "new and independent injury" triggers its own four-year limitations period. *Id.* "[E]ach time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred." *Id.* at 1105. Thus, for each injury asserted by plaintiff, I must determine precisely when plaintiff should have discovered it.

The first predicate act asserted by plaintiff, the 1985 proxy statement mailing, urged shareholders to approve the issuance to Cumming and Steinberg of 200,000 warrants each. The plan was subsequently approved. Plaintiff asserts that this corporate event generated, years later, two additional injuries. The first injury was the Board's decision in November, 1989, to repurchase most of the 1985 warrants from Cumming and Steinberg at a cost of $7.5 million. (The price reflected the difference between the exercise price and the then-current market price of Leucadia shares.) The second injury was the Board's decision sometime in 1990 to repurchase a smaller block of warrants at a cost of $95,000.

The first question to be addressed, then, is whether these injuries should have been discovered in 1985. If both repurchase decisions—and their precise cost to the company—could have been clearly foreseen and ascertained when the warrants were issued, then any injury from these decisions accrued

---

agree. The fact that plaintiff's sole shareholder and plaintiff's attorney are husband and wife does not extinguish plaintiff's financial interest in Leucadia, as represented by 1,500 shares of Leucadia stock. Nor does it create a conflict between plaintiff's interest and those of the other shareholders. Plaintiff is excused from making demand on the corporation because the Complaint specifies its reasons for not making demand, including the fact that defendants are directors of the company and approved the alleged wrongdoing. *See* N.Y.Bus.Corp.Law § 626(c); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 102, 111 S.Ct. 1711, 1719, 114 L.Ed.2d 152 (1991) (holding that demand is excused under New York law "when a majority of the di-

rectors have participated in or approved the alleged wrongdoing"); *Barr v. Wackman*, 36 N.Y.2d 371, 368 N.Y.S.2d 497, 504–05, 329 N.E.2d 180, 185–86 (1975) (same). Finally, defendants contend that plaintiff fails to plead its fraud claims with the particularity required by Fed.R.Civ.P. 9(b). Because I find that no fraud occurred, I need not reach this issue.

4. Plaintiff may not assert a claim as to this act for a second reason. Under Fed.R.Civ.P. 23.1, plaintiff may not recover for any injury the company sustained before plaintiff became a shareholder in June, 1987.

in 1985 and is time-barred. *See Long Island Lighting Co. v. Imo Indus.*, 6 F.3d 876, 887 (2d Cir.1993) (holding that injury from defective generators accrued upon receipt, when defects should have been discovered, not four to six years later when generators were actually installed). If, on the other hand, the Board's decisions to repurchase the warrants were not clearly foreseeable in 1985, injury would accrue only when the Board took action on the warrants and the extent of the injury became concrete. *See Cruden v. Bank of New York*, 957 F.2d 961, 977 (2d Cir.1992) (citations omitted).

■ Defendants maintain that any injury from the repurchases of the warrants necessarily accrued in 1985 because "plaintiff had actual notice of all of the facts regarding the validity of the 1985 Warrants" in 1985. (Mem. in Support of Defs.' Motion to Dismiss at 22.) Defendants are incorrect. The validity of the warrants is not the dispositive factor. For accrual purposes, the dispositive factor is when plaintiff should have discovered injury from the repurchase transactions. Nothing in the record suggests that the Board knew in 1985 if or when it would repurchase the warrants. Corporations do not repurchase every stock option they issue. Moreover, even if the Board could reasonably have anticipated or controlled any future repurchases of the warrants, it could not have predicted the cost, which was linked to the share price at the time of repurchase. Thus, I find that any anticipated repurchase of the warrants was merely speculative in 1985.

Assuming that no separate injury accrued until the Board decided to repurchase the warrants, I find that the first repurchase injury asserted by plaintiff is time-barred. The Complaint states: 1) that the Board decided to repurchase 786,000 warrants in 1989, and 2) that full payment stretched out over a period of seven months, ending on June 30, 1990—a date safely within the limitations window. (Compl. at 14.) From these facts, plaintiff attempts to rescue its claim from certain death by observing that some warrants were paid for after May 11, 1990. (Mem. in Opp. to Defs.' Motion to Dismiss at 6.) This argument is unavailing. Under *Bankers Trust*, the timing of the actual pay-

ments is immaterial. Injury accrues at the first moment when the injury should have been discovered, and in the case of a financial obligation that moment occurs when the obligation attaches. *Id.* at 1105 (holding that injury arising from financial obligation accrues "as to each expense when [injured party becomes] obligated to pay that expense, and not at some later date when it actually [makes] the payment").

In the instant case, the decision to repurchase the 786,000 warrants was explicitly and fully disclosed in the 1990 proxy statement, (1990 Proxy Statement at 30), a document which plaintiff concedes was mailed several weeks before the shareholders' meeting of May 11, 1990. Thus, the injury should have been discovered before May 11, 1990, and is barred by the statute of limitations.

■ The second repurchase decision cited in the Complaint, however, is not so easily dismissed because of the scanty evidence in the record presented to me. The Complaint states that sometime in 1990 the Board repurchased an additional set of 1985 warrants. (Compl. at 14.) However, the Complaint provides no facts to support this allegation, and the 1990 and 1991 proxy statements, which the Complaint incorporates by reference, mention no new repurchase transaction undertaken after 1989. Assuming that such a transaction occurred, I must construe the ambiguity in the record in plaintiff's favor. Because plaintiff might not have been able to discover the asserted injury before May 11, 1990, I find that the claim survives for the purposes of this motion. However, defendants may submit a renewed motion on the statute of limitations defense, if appropriate after further discovery.

■ The second predicate act asserted by plaintiff, the 1990 proxy statement, urged shareholders to approve a merger between Leucadia and another company. Plaintiff maintains that this act also generated a subsequent injury: the merger itself, which was approved at the shareholders' meeting of May 11, 1990. I agree with plaintiff that this claim is not time-barred. The directors did not control enough voting stock to approve the merger on their own; they needed eight

percent of the outside shareholders to form the two-thirds majority required to approve the merger. Thus, the mere mailing of the proxy statement did not cause the injury to accrue. If the merger proposal had not passed at the shareholders' meeting, plaintiff would have had no claim to assert. I find, therefore, that the merger accrued when the shareholder votes were cast and that this claim of injury survives the limitations challenge.

## II. The RICO Claims

■■■■ The above findings are overshadowed, however, by plaintiff's failure to state a RICO violation. The RICO civil liability provision confers standing on any "person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The Supreme Court has further limited standing to plaintiffs whose injuries were proximately caused by a RICO violation. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992). The requirement of proximate causation generally means that shareholders may not bring civil RICO claims in their individual capacities, but they may sue derivatively on behalf of the corporation. *Manson v. Stacescu*, 11 F.3d 1127, 1130–31 (2d Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994); *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). In the instant case, plaintiff is a corporate shareholder suing in a derivative capacity.

■■■ To maintain a shareholder's derivative suit under RICO, a plaintiff must show: 1) a violation of 18 U.S.C. § 1962; 2) injury to business or property; and 3) causation of the injury by the violation. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). As a matter of law, I find that plaintiff fails to establish the first element, a violation of § 1962, because the Complaint fails to allege facts from which mail fraud or wire fraud can be inferred. This finding is fatal not only to the RICO counts, but to the state law claims of conversion and common

law fraud, which will be discussed in more detail in Part III *infra*.

### A. The Violation of § 1962

The Complaint alleges violations of 18 U.S.C. § 1962(b), (c) and (d)—two substantive violations and one conspiracy claim. All three prongs of § 1962 require a showing that defendants engaged in certain prohibited activities through "a pattern of racketeering activity." By statute, a pattern of racketeering activity requires at least two acts of racketeering activity within 10 years. 18 U.S.C. § 1961(5). An act of "racketeering activity," in turn, may be any one of the federal and state crimes enumerated in 18 U.S.C. § 1961(1), including mail fraud and wire fraud.

The federal crimes pleaded by plaintiff, however, do not exist in a vacuum. Mail and wire fraud necessarily arise from an underlying "scheme or artifice to defraud." 18 U.S.C. §§ 1341 and 1343. The Complaint fails to establish any such scheme. Plaintiff's entire argument rests on an incorrect interpretation of N.Y.Bus.Corp.Law §§ 505 and 612. Because I find that defendants did not violate these New York statutes, all four asserted predicate acts fail as a matter of law.

### i. N.Y.Bus.Corp.Law § 505

Three of the predicate acts alleged in the Complaint stem from an asserted violation of § 505, which regulates the issuance of stock options. Section 505 provides in relevant part:

(a)(1) Except as otherwise provided in this section …, a corporation may create and issue … rights or options entitling the holders thereof to purchase from the corporation, upon such consideration, terms and conditions as may be fixed by the board, shares of any class or series[.]

. . . .

(d) The issue of such rights or options to one or more directors, officers or employees of the corporation …, as an incentive to service or continued service with the corporation, … shall be authorized at a meeting of shareholders by the vote of the holders of a majority of all outstanding

shares entitled to vote thereon, or authorized by and consistent with a plan adopted by such vote of shareholders.

. . . .

(h) In the absence of fraud in the transaction, the judgment of the board shall be conclusive as to the adequacy of the consideration, tangible or intangible, received or to be received by the corporation for the issue of rights or options for the purchase from the corporation of its shares.

Leucadia issued stock options ("warrants") to Cumming and Steinberg in 1985, 1991 and 1992. On each occasion, the Board sought shareholder approval by mailing proxy statements. In the first two mailings, the Board urged approval of the warrants in recognition of Cumming and Steinberg's "record achievements during the past [several] years." The third proxy statement disclosed that Cumming and Steinberg had offered to sell their 1991 warrants back to the company in exchange for an equal number of new warrants at market prices, and that the Board believed this exchange was in the company's best interest. All three proxy statements contained, *inter alia,* the following information: the number of warrants to be issued, the exercise price, the then-current market price of shares, the beneficial ownership of Cumming and Steinberg in Leucadia common stock, the fact that approval of the warrants required a majority vote of shareholders, the fact that the directors as a group held majority control of Leucadia, and the fact that all directors intended to vote in favor of the proposal. Each proposal, as expected, was approved.

Plaintiff asserts that in issuing these warrants, defendants ran afoul of § 505 in two ways: first, by failing to obtain "consideration" for the warrants and second, by failing to impose conditions of "service or continued service" on Cumming and Steinberg. Plaintiff maintains that these lapses rendered the warrants void either as a matter of law or, alternatively, because the transactions were not fair and reasonable to the corporation.

██ I find that plaintiff misinterprets § 505 and takes an overly narrow view of executive compensation. Corporations have long used salary bonuses, particularly in the form of stock or stock options, to retain valued employees and align the interests of shareholders and management.[5] A salary bonus is not a gift, as plaintiff implies. It is a form of compensation. The consideration received is the value of services rendered.

In the instant case, the Board expressly stated that the 1985 and 1991 warrants were being issued in recognition of the officers' "record achievements" on behalf of the company. (Compl. at 12, 22.) There is nothing in the record to indicate that the Board's statement was fraudulent. Indeed, the record indicates that under Cumming and Steinberg's management the share price rose steadily and the stock split several times. Plaintiff even increased its own stake in Leucadia from an initial investment of 100 shares in 1987 to 1,500 shares as of the date of the Complaint. (Compl. at 2.) It would be difficult to conclude from the record, then, that Cumming and Steinberg failed to perform valuable services worthy of compensation. In short, I find that the warrants were issued for consideration in compliance with § 505(h), which states that, absent fraud (of which I find no allegation in the Complaint to support an inference), the judgment of the board is conclusive as to the adequacy of consideration.

I next turn to plaintiff's argument that § 505(d) requires corporations to extract a guarantee of "service or continued service" from employees who accept stock options. The plain language of § 505(d) indicates no such requirement. The section provides only that when options are issued as an incentive to service or continued service, the share-

---

**5.** In New York, this issue has been settled for half a century. *See, e.g., Diamond v. Davis,* 38 N.Y.S.2d 103, 113 (Sup.Ct.) (holding that a bonus or option may be granted to a valued corporate officer "as an incentive to retain his services, sharpen his interest, intensify his zeal, spur him on to more ardent effort in the interest and for the benefit of the company, and to enable him thereby to share in the resulting success of the enterprise"), *aff'd,* 265 A.D. 919, 39 N.Y.S.2d 412 (1942), *aff'd,* 292 N.Y. 552, 54 N.E.2d 683 (1944); *see also Diamond v. Davis,* 62 N.Y.S.2d 181, 189 (Sup.Ct.1945) ("If after full, free and frank disclosure the bonus plan is adopted or ratified by the majority stockholders, it is usually binding on the minority.").

holders must approve the transaction. In this case, they did so. The common meanings of the relevant terms apply. An "incentive" in common usage does not require the recipient to undertake a future contractual obligation to the offeror. An incentive is merely an inducement, "something that constitutes a motive or spur." (*Webster's Third New International Dictionary* (1986).) In the context of employee compensation, stock options operate as an inducement "to retain [the employee's] services, sharpen his interest, [and] intensify his zeal." *Diamond v. Davis*, 38 N.Y.S.2d 103, 113 (Sup.Ct.1942). Similarly, the term "service or continued service" as used in § 505 supports the conclusion that stock options may be issued for either "current" or "future" service. In the instant case, to the extent warrants were issued to Cumming and Steinberg for current service,[6] they were issued in full compliance with § 505.

For the foregoing reasons, I find that as a matter of law the Complaint fails to assert facts from which fraudulent or misleading statements in the proxy mailings can be inferred. Therefore, the proxy statements do not form the basis for mail or wire fraud and the mailings of these proxy statements do not qualify as RICO predicate acts.

### ii. N.Y.Bus.Corp.Law § 612

The above analysis leaves only one predicate act remaining in plaintiff's Complaint: the alleged violation of N.Y.Bus.Corp.Law § 612. Because a RICO violation cannot rest on a single predicate, plaintiff's RICO claim necessarily fails. Nevertheless, I address the legal basis for the allegation concerning the final predicate act solely because of its potential relevance to the state law claims.

Section 612 regulates the shareholder voting process. At issue is § 612(b), which provides in relevant part:

[S]hares held by another ... corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held by the corporation, shall not be shares entitled to vote or to be counted in determining the total number of outstanding shares.

In 1990, the Board proposed a merger with MIC, a corporation in which Leucadia held a majority interest. The merger, which shareholders approved, brought an end to a complex ownership structure in which three entities essentially held majority interests in each other. Leucadia owned 56 percent of MIC, MIC owned 54 percent of a partnership named TLC Associates, and TLC in turn owned 59 percent of Leucadia. The result was that a small group of individuals (principally Cumming, Steinberg and two other defendants) controlled most of Leucadia's voting stock—and had done so since plaintiff first became a shareholder in 1987. (Compl. at 8.) The merger proposal further included a requirement that TLC be dissolved as a partnership.

Plaintiff contends that the sole purpose of the merger was to "transfer direct control of Leucadia to Cumming and Steinberg," (Compl. at 16), and that defendants, in their zeal to effect the merger, deliberately misled shareholders in the 1990 proxy statement. Plaintiff's claim focuses on the Board's statement in its proxy mailing that TLC planned to vote its majority block of Leucadia shares in favor of the merger, and that therefore only 8 percent of the outside shareholders were needed to approve the plan. Plaintiff argues that § 612(b) prohibited TLC from voting its shares in favor of the merger. Plaintiff contends that because TLC was indirectly *owned by* Leucadia due to the circular ownership structure previously described, TLC was effectively a subsidiary of Leucadia and was precluded from voting its parent's shares under § 612(b).

Plaintiff's argument is both tortured and meritless. Section 612(b) applies only to corporations, and specifically to relationships between parent and subsidiary corporations.

---

**6.** In their motion papers, defendants state that they issued the warrants for "past services," which in context appears to be an attempt to distinguish past from future services. Defendants' distinction does not change the analysis above. Cumming and Steinberg were current employees of Leucadia when the warrants were issued and the warrant transfers were incentives, based on past performance, for current service.

The statute provides that a subsidiary controlled by its parent corporation may not vote shares of the parent's stock. *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 262 (2d Cir.1984). TLC, however, was a partnership and was not a subsidiary of Leucadia. Moreover, even if § 612(b) did apply to partnerships, the Complaint fails to allege facts sufficient to conclude that Leucadia ever held a controlling interest in TLC. The Complaint states that Leucadia held a 56 percent interest in MIC, which in turn held a 54 percent interest in TLC. The math goes as follows: .56 × .54 = .30. If Leucadia indeed held only a 30 percent interest in TLC, this does not constitute a majority interest as defined in § 612(b).

### III. The State Law Claims

For the reasons addressed in the foregoing discussion, two of plaintiff's state law claims fail as a matter of law. Plaintiff asserts a claim of conversion against Cumming and Steinberg and a claim of common law fraud against all defendants. In New York, conversion is the "unauthorized exercise of dominion over the property of another to the exclusion of the owner's right, or the unauthorized use of that property." *City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F.Supp. 1273, 1280 (E.D.N.Y.1995) (citing 23 N.Y.Jur.2d, Conversion § 1). Fraud includes intentional misrepresentation, among other elements. *See, e.g., Roso v. Saxon Energy Corp.*, 758 F.Supp. 164 (S.D.N.Y.1991). Because I have found that the issued warrants were legally valid and the proxy statements disclosed all relevant facts, and because the Complaint offers no other factual basis for inferring conversion or fraud, these state law claims must be dismissed.

When the fraud aspects of plaintiff's other state law claims are peeled away, however, their gist is that Cumming and Steinberg have been systematically overpaid by millions of dollars because they "dominate" and "control" their fellow directors financially. (Compl. at 6.) Plaintiff cites a set of complex business arrangements among defendants that allegedly have fostered this domination. (Compl. at 9–11.) Plaintiff further contends that the Board approved the warrant transactions solely to funnel cash and corporate control into Cumming and Steinberg's pockets, (*id.* at 6, 9), and that the Board was aware that the transactions were not in the company's best interest, (*id.* at 27–8).

These facts are sufficient to state a claim for breach of fiduciary duty and corporate waste. Directors and officers owe a fiduciary duty to manage the property of the corporation "in good faith, according to their best judgment and skill, and in the interest of the stockholders." *Amfesco Industries, Inc. v. Greenblatt*, 172 A.D.2d 261, 568 N.Y.S.2d 593, 595 (1st Dep't 1991). The common law characterizes this obligation as having two prongs, the duty of care and the duty of loyalty. The duty of loyalty implies an absolute prohibition against self-dealing. *See, e.g., Norlin*, 744 F.2d at 264. Taking the facts alleged in the Complaint as true and drawing all reasonable inferences in the plaintiff's favor, the Complaint asserts a claim of self-dealing. "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation." *Id.* The record is simply not well developed enough at this point to indicate whether the warrant transactions were or were not in the best interest of the corporation or whether, with respect to executive compensation, the directors were or were not exercising their best business judgment in good faith.

However, adjudication of these remaining state law claims in federal court hinges on the existence of diversity of citizenship required by 28 U.S.C. § 1332(a). In their motion to dismiss, defendants contend that diversity is lacking here. I cannot decide the jurisdictional questions presented, however, on the facts in the record before me. For this reason, I deny defendants' motion to dismiss the remaining claims but grant leave to refile a motion to dismiss, if appropriate, at the close of discovery on the limited issue of whether diversity exists between the parties. I hereby direct the parties to conduct a short and focused period of discovery, as specified *infra*, on the issue of

diversity. The following discussion of law is intended to guide this discovery process.

For purposes of diversity jurisdiction, a corporation is considered to be a citizen both of the state of its incorporation and the state where it maintains its "principal place of business." 28 U.S.C. § 1332(c). In the instant case, it is undisputed that defendant Leucadia is a New York corporation and that most of the individual defendants are citizens of New York. The sole issue is whether plaintiff's principal place of business is Delaware, as plaintiff claims, or New York. It is well settled that the party asserting jurisdiction has the burden of proving it. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Danbury Bowlarama Corp. v. RCA Corp.,* 414 F.Supp. 354 (S.D.N.Y.1976). Thus, the burden rests on plaintiff Pinnacle Consultants, Ltd. to establish that its corporate soul resides in Delaware.

The courts have adopted several tests to determine a corporation's principal place of business, all highly fact-sensitive and all designed to identify that single location where a corporation carries out its central purpose. Although the tests emphasize different facts, their underlying logic is consistent and closely follows the express intent of Congress in creating the "principal place of business" rule in 1958. Before that time, corporate citizenship was determined solely by the state of incorporation. Congress amended 28 U.S.C. § 1332 in a deliberate attempt to expand the basis for corporate citizenship and thereby to "reduce the case load of the federal courts and to remedy abuses of diversity jurisdiction." *J.A. Olson Co. v. Winona,* 818 F.2d 401, 405 (5th Cir.1987).[7] The courts immediately inherited the task of defining "principal place of business" and found that it could not be captured in a single formula.

The "nerve center" test, set out in *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y.1959), was crafted in the context of the Underwood Corporation, a sprawling typewriter maker with sales offices and manufacturing plants in many states. The *Scot* court, searching for Underwood's "center of gravity," concluded:

> Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.

*Id.,* 170 F.Supp. at 865. The court then held that Underwood's nerve center was New York, where its executive offices were located and where it formulated policy for every aspect of the corporation.

Just a year later, the Third Circuit announced that the "nerve center" test was not helpful in dealing with the much larger and more complex corporate web of U.S. Steel. *Kelly v. U.S. Steel Corp.,* 284 F.2d 850, 853 (3d Cir.1960). The court in *Kelly* articulated a second influential test, the "center of activity" or "center of operations" test, which did not contradict the "nerve center" test so much as develop it. In *Kelly,* the court declined to assign corporate citizenship merely to the state where the Board of Directors met or where the highest-ranking officers happened to live. In the case of U.S. Steel, whose primary operations were mining and manufacturing, the court looked instead for the place where corporate executives actually ran the "business of the corporation." *Id.* at 854. That situs was held to be Pennsylvania, where the chief executives formulated "operations policy" relating to mining and manufacturing and where most of the management staff worked.[8]

---

**7.** *See also R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 654 (2d Cir.1979) (holding that purpose of amendment was to eradicate "the evil whereby a local institution, engaged in a local business and in many cases locally owned, is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another state.") (citing S.Rep. No. 1830, 85th Cong., 2d Sess. 4 (1958),

U.S.Code Cong. & Admin.News 1958 pp. 3099, 3101–3102).

**8.** The Second Circuit's leading case on diversity jurisdiction, *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651 (2d Cir.1979), articulated a slightly different test using principles similar to those in *Kelly.* I do not rely explicitly on the Second Circuit test, which emphasizes the corpo-

Although the "nerve center" test and the "place of activity" test are sometimes discussed as separate and mutually exclusive lines of analysis, the Fifth Circuit has adopted the most reasonable approach in my view by articulating the "total activity" test, which dictates a "thorough review" of all corporate activity. *Village Fair Shopping Center Co. v. Sam Broadhead Trust*, 588 F.2d 431, 434 (5th Cir.1979) (citations omitted). The "total activity" test expressly incorporates both the "nerve center" and "place of activity" tests, *id.*, and finds them to be complementary, *Olson*, 818 F.2d at 410. Indeed, *Olson* cautions that "the principal place of business is a fact question that follows no single inflexible test." *Id.* at 406. *Olson* goes on to offer the following general rules:

> (1) when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principal place of business; (2) when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant; but (3) when the activity of a corporation is passive and the "brain" of the corporation is in another state, the situs of the corporation's "brain" is given greater significance.

*Id.* at 411. Finally, *Olson* advises that a corporation's citizenship is to be found in that state "where, more than any other place, its corporate purpose is fulfilled." *Id.* at 413.

In the instant case, Pinnacle is not a conventional corporation in the sense of manufacturing or selling goods or providing services to the public. As the record attests, Pinnacle buys and sells stock for the benefit of its sole shareholder and President, Anne-Renee Testa of New York City. Since the date of this lawsuit, Pinnacle's holdings have been limited to 1,500 shares of Leucadia stock. The relative passivity of plaintiff's operations has caused the parties to dispute not only the locus of plaintiff's business, but what plaintiff's "business" actually is.

In their motion to dismiss, defendants contend that Pinnacle maintains no physical office in Delaware and therefore it transacts no business there. Defendants maintain that Pinnacle's true headquarters is New York, the domicile of Ms. Testa and her husband, Lester Tanner, who is plaintiff's attorney in this action and a former officer and director of Pinnacle. (Mem. in Support of Defs.' Motion to Dismiss at 28.) From these sparse facts, defendants argue that New York is both Pinnacle's "nerve center" and its "place of operations." However, defendants have not adduced enough evidence to permit such a conclusion. Although Ms. Testa and Mr. Tanner surely exercise at least some control over corporate policy, the record does not establish that they are plaintiff's sole decision makers. Nor does it support a firm conclusion that corporate policy is formulated in New York or that investment activity occurs solely or even primarily there.

Plaintiff responds with an equally incomplete array of facts and arguments. It states that its principal place of business is Delaware because it is incorporated there and has a registered agent for service of process there. Plaintiff also asserts that Pinnacle maintains no office other than its registered office in Delaware; that Mr. Tanner served as an officer and director of Pinnacle from 1985 to 1994, and that Paul Mesches replaced Mr. Tanner as Vice President and Secretary of Pinnacle on May 11, 1994. (Aff. of Anne-Marie Testa at 2–3.) Plaintiff then argues that the "nerve center" test cannot be applied to Pinnacle because it is not a corporation with far flung operations, and that the "place of operations" test should be applied in the following manner: "[S]ince Pinnacle's sole 'business' consists of its holding a minority interest in Leucadia, its place of operations is effectively the state of its incorporation, the only state where it need file reports or pay taxes and the only state where it has a registered agent for service of process." (Mem. in Opp. to Defs.' Motion to Dismiss at 27.)

---

ration's locus of "most extensive contact with the public," because the test makes a poor fit with the type of corporation involved in the instant case. I do, however, follow its underlying logic, which assumes the paramount importance of the corporation's central activities or operations.

Plaintiff's arguments are not persuasive. The "nerve center" test has never been strictly limited to corporations of the far flung type; the test has also been applied to corporations that are more closely akin to Pinnacle, such as investment companies, *see Village Fair*, 588 F.2d at 432–34; holding companies, *see Lugo–Vina v. Pueblo Int'l, Inc.*, 574 F.2d 41, 44 (1st Cir.1978) (citations omitted); and corporations in which management functions predominate over sales or services to the public, *see Danbury Bowlarama Corp. v. RCA Corp.*, 414 F.Supp. 354, 357 (S.D.N.Y.1976). Indeed, the reasoning articulated in *Village Fair* may be particularly relevant here. In *Village Fair*, an investment management corporation was held to be a citizen of the state where the investment and management decisions were made, despite the fact that investment assets themselves were located in several states. *Village Fair*, 588 F.2d at 434. It was *Village Fair* that gave rise to the rule articulated in *Olson* that "when the activity of a corporation is passive and the 'brain' of the corporation is in another state, the situs of the corporation's 'brain' is given greater significance." *Olson* at 411. Thus, the "nerve center" test may well be applicable to the facts in the instant case.

Plaintiff also mischaracterizes the "place of operations" test, which was never intended to elevate routine activities to the status of dispositive facts. Every corporation files reports and pays taxes in the state of its incorporation. The filing of such reports and the payment of such taxes proves nothing more than that the business was incorporated in a particular state—a fact that has been insufficient to determine citizenship since 1958. The true goal of the "place of operations" test is to identify those factors that are unique to the business: its signature activities and the place in which they are conducted. As plaintiff concedes, "Pinnacle's business has been the purchase and sale of stocks." (Aff. of Anne–Renee Testa at 3.) Plaintiff also states that its Leucadia stock is held in Pinnacle's brokerage account at Sanford C. Bernstein & Co. in New York, and that the brokerage firm mails a monthly statement to Pinnacle in care of Ms. Testa as President in New York. (*Id.*) The record further specifies some of the management decisions that Pinnacle directors have made. One was the initial purchase of Leucadia stock in 1987. Another was the purchase of additional Leucadia stock sometime before the instant lawsuit was filed. A third was the decision to sell or distribute to Ms. Testa all holdings except the Leucadia stock before Jan. 3, 1994. (*Id.*) A fourth decision, presumably related to protecting the value of Pinnacle's investments, was the decision to file the instant lawsuit.

Pinnacle's central purpose, then, is not to file reports and pay taxes but to manage an equity portfolio. The sole remaining issue is "where, more than any other place, [plaintiff's] corporate purpose is fulfilled," *Olson* at 413. This question can be resolved only by further discovery as to where and by whom the corporate decisions are made.

### Conclusion

In sum, the Securities Exchange Act claim is dismissed for exceeding the statute of limitations. The federal RICO claims and the state law claims of conversion and common law fraud are dismissed for failure to state a claim. Discovery on the remaining state law claims, corporate waste and breach of fiduciary duty, is stayed pending the outcome of discovery on diversity jurisdiction. Discovery on diversity will proceed according to the following guidelines:

By December 15, 1995, plaintiff will submit to defendants an affidavit, by a person with knowledge of the facts, setting forth the following information: the names and addresses of all corporate officers and employees; the place where Board of Directors meetings are held; the names and addresses of all firms that prepare and mail plaintiff's annual reports and other financial statements; the name(s) and address(es) to which Pinnacle's official mail is sent; the location of Pinnacle's corporate books and records; the situs of its banking activities, if any; the place where Pinnacle's pension plan, if any, is managed; the names and addresses of all persons who make investment and management decisions for Pinnacle; the names and addresses of all persons who formulate other areas of corporate policy, such as the decision to file the instant lawsuit; the location where major decisions affecting the corporation are made;

and a description of the mode (e.g., personal meeting, telephone call) in which corporate decisions are made. Plaintiff's affidavit must also set forth any other information it believes relevant to its jurisdictional argument. For one month, if necessary, defendants are permitted to conduct additional discovery on the jurisdictional issue by way of deposition or interrogatories.

By Jan. 19, 1996, if warranted, defendants will refile their motion to dismiss for lack of subject matter jurisdiction, addressing and expanding on the issues raised by the Court in this opinion. The motion will be limited to fifteen pages. Plaintiff will submit a response, also of no more than fifteen pages, by Feb. 2, 1996, and defendants will submit a reply of no more than ten pages by Feb. 9, 1996. The *completed papers* will be filed with the Clerk of the Court on Feb. 13, 1996, with a courtesy copy to chambers. If either party desires an evidentiary hearing on the diversity issue, that party should request such a hearing in writing, setting forth both the purpose of the hearing and the witnesses to be heard by the court. If defendants decide not to undertake additional discovery after receiving plaintiff's affidavit, they should confer with plaintiff and advance the motion schedule set forth herein.

**SO ORDERED.**