(2008)
Jessica VENTIMIGLIA, Paul Pfleiderer, Gina Eppolito, Wendy Williams-McDonnell, Mark McDonnell, Darryl J. Osojnak, Beth Osojnak, Sharise Greenwald, Leonard Wasserman, Albert Comanda, and Angeline Comanda, individually and on behalf of themselves and all other persons similarly situated, Plaintiffs,
v.
TISHMAN SPEYER ARCHSTONE-SMITH WESTBURY, L.P., f/k/a ASN Roosevelt Center, LLC d/b/a Archstone Westbury, Defendant.
In re Archstone Westbury Tenant Litigation.
Richardo Francois, Pat Marchese, David Dickman, Paul Balzano, Bettianne Balzano, Steve Randall, Joyce Randall, Xavier Carter, Jeffrey Nieves, Plaintiffs,
v.
Tishman Speyer Archstone-Smith Westbury, L.P., f/k/a ASN Roosevelt Center, LLC d/b/a/ Archstone Westbury, Defendant.
Nos. 08CV1010 (ADS)(ETB), 08CV1751 (ADS)(ETB).
United States District Court, E.D. New York.
November 28, 2008.

MEMORANDUM OF DECISION AND ORDER
SPATT, District Judge.

I. BACKGROUND

The following facts are derived from the pleadings and the parties' submissions on the motions.
The plaintiffs in these putative class actions are former tenants of a luxury apartment complex located at 1299 Corporate Drive, Westbury, N.Y. 11590 (the "Westbury Complex"). On or about November 27, 2008, the tenants were notified by their landlord, ASN Roosevelt Center, LLC d/b/a Archstone Westbury ("Archstone Westbury"), that they would have to vacate their apartments due to water intrusion issues at the Westbury Complex. The tenants were instructed that their leases would be terminated and they had to vacate the premises no later than March 31, 2008. The letter explained that mold had been found in spaces between the exterior and interior of the wall surfaces and that due to the extensive nature and scope of the work required to be done, the buildings would need to be vacant during reconstruction. The tenants dispute whether the leases were appropriately vacated.
On November 28, 2007, Andrea Sorrentino, and others, filed a putative class action in New York State Supreme Court, Nassau County on behalf of herself and all present and former Archstone Complex tenants, naming only Archstone Westbury as a defendant ("the Sorrentino Action"). Following a motion to dismiss by the defendants, Sorrentino amended her class action complaint on January 7, 2008, adding fourteen plaintiffs and two Archstone Westbury affiliates as defendantsArchstone Smith Communities, LLC and Archstone Smith Operating Trust. In addition, the plaintiffs added claims for medical monitoring and violation of N.Y. Gen. Bus. Law § 349.
Two additional class action cases were filed by residents of the Westbury Complex in state court in December 2007, Marchese v. ASN Roosevelt Center, LLC, Index No. 07/021745, and Francois v. ASN Roosevelt Center, LLC, Index No. 07/021967 (jointly, the "In re Archstone Westbury Tenant Litigation"). In addition, on February 22, 2008 Jessica Ventimiglia, and others, filed a putative class action in New York State Supreme Court, Nassau County, naming only Archstone Westbury as a defendant, Index No. 07/021135 ("the Ventimiglia Action").
On February 6, 2008 in Supreme Court, Nassau County, the Honorable Leonard B. Austin granted the plaintiffs' unopposed motion to consolidate the Sorrentino action with the Marchese and Francois actions. Justice Austin's order provided that all class actions subsequently filed in the Nassau Supreme Court which arise out of the same facts and circumstances shall be consolidated for all purposes. However, the final order was not entered by the Nassau County Clerk until February 14, 2008.
In the interim, on February 8, 2008, the two newly-named defendants in the Sorrentino Action filed a notice of removal to this Court. On March 10, 2008, the plaintiffs moved to remand this action to Supreme Court, Nassau County. That motion remains pending.
In addition, on March 11, 2008, and April 29, 2008, respectively, the defendant Archstone Westbury removed the Ventimiglia Action and the In re Archstone Westbury Tenant Litigation action to this Court asserting jurisdiction pursuant to the Class Action Fairness Act of 2005. The plaintiffs have moved for remand in each of these cases. The Court now issues the instant Order granting the plaintiffs' motion to remand these two actions.
Both the Ventimiglia Action and the In re Archstone Westbury Tenant Litigation action differ from the Sorrentino Action in two important respects. First, the Sorrentino class included "all tenants who lived at Archstone Westbury pursuant to leases with Defendant on or prior to November 27, 2007 and their successors in interest," whereas the plaintiff classes in the Ventimiglia Action and the In re Archstone Westbury Tenant Litigation were narrowly structured to include only those persons who (a) are or were residents of the Westbury Complex and (b) were citizens of the State of New York at the commencement of the action. In addition, following the amendment in the Sorrentino Action, that case names three defendants, namely Archstone Westbury, the Archstone-Smith Operating Trust, and Archstone-Smith Communities, LLC. However, the Ventimiglia and In re Archstone Westbury Tenant Litigation eases name only Archstone Westbury as a defendant. These differences create jurisdictional distinctions among the cases.
As the jurisdictional issues in the Ventimiglia Action and In re Archstone Westbury Tenant Litigation are the same, the Court treats the motions to remand those two cases together.

II. DISCUSSION

The defendants removed these actions citing 28 U.S.C. § 1332(d) as the basis for federal jurisdiction. The Class Action Fairness Act of 2005, ("CAFA"), Pub.L. No. 109-2. 119 Stat. 4 (codified in scattered sections of 28 U.S.C., including § 1332), expanded federal diversity jurisdiction over state-based class actions. Enacted on February 18, 2005, the purpose of the CAFA, was to amend the "procedures that apply to consideration of interstate class actions to assure fairer outcomes for class member and defendants." Id. (emphasis added).
CAFA vested federal district courts with diversity jurisdiction over class actions where (1) there is minimal diversity, i.e., at least one plaintiff and one defendant are citizens of different states; (2) the proposed class contains at least 100 members; and (3) the amount in controversy is at least $5 million in the aggregate, exclusive of interest and costs. 28 U.S.C. § 1332(d); Blockbuster, Inc. v. Galeno, 472 F.3d 53, 56 (2d Cir.2006). The statute further contains a removal provision that allows for any such case filed as a class action in state court to be removed to federal court. 28 U.S.C. § 1453. "Section 1453 permits a defendant to remove a class action even if a co-defendant is a citizen of the state in which the action was originally brought and without the consent of the other defendants in the action." Blockbuster, 472 F.3d at 56.
The plaintiffs contend that this action is not subject to federal jurisdiction because the defendants have failed to satisfy the $5 million amount in controversy requirement and because minimal diversity of citizen is lacking in this case. Even if minimal diversity and the amount in controversy requirements are met, the plaintiffs contend that the Court must remand this case under one of three exceptions to CAFA jurisdiction.

A. Burden of Proof
The Second Circuit has made clear that the party asserting federal jurisdiction under CAFA bears the burden of establishing jurisdiction. Blockbuster, 472 F.3d at 57-58; DiTolla v. Doral Dental IPA of New York, LLC, 469 F.3d 271, 275 (2d Cir.2006); Mattera v. Clear Channel Commc'ns, Inc., 239 F.R.D. 70, 78 (S.D.N.Y.2006). In addition, the Court must construe all ambiguities and draw all reasonable inferences in favor of the party asserting federal jurisdiction. Mattera, 239 F.R.D. at 78.
Further, while the Second Circuit has not ruled on the issue, the Court agrees with the weight of authority finding that the party resisting federal jurisdiction pursuant to one of CAFA's exception provisions bears the burden of proving that a CAFA exception applies. Mattera, 239 F.R.D. at 79 ("[P]lacing the burden of establishing the applicability of a CAFA exception on the party challenging federal jurisdiction, rather than on the party invoking federal jurisdiction at the outset, better protects against the risk of state courts adjudicating class actions with national ramifications."); Brook v. United-Health Group Inc., No. 06CV12954, 2007 WL 2827808, at *3 (S.D.N.Y. Sept.27, 2007) ("[T]he party opposing the exercise of the Court's established jurisdiction bears the burden of demonstrating that a CAFA exception exists."); see also Hart v. FedEx Ground Package System Inc., 457 F.3d 675, 681 (7th Cir.2006).

B. As to the Jurisdictional Amount
The removing defendant must show that it appears to a "reasonable probability" that the aggregate claims of the plaintiff class are in excess of $5 million. Blockbuster, 472 F.3d at 58; Kocienda v. U-Haul Intern., Inc., No. 3:07CV0954, 2007 WL 2572269, at *1 (D.Conn. Sept. 4, 2007). Facts relating to the jurisdictional amount can be challenged by the plaintiff, thereby requiring the defendant to support those facts with a "competent proof by a preponderance of the evidence. United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301-02 (2d Cir.1994). In determining the amount in controversy, courts first turn to the allegations of the plaintiffs complaint. See DiTolla, 469 F.3d at 276; Kocienda, 2007 WL 2572269, at *1 ("The Court must evaluate the amount in controversy on the basis of the pleadings viewed at the time of the filing of the notice of removal."). Where "the pleadings themselves are inconclusive as to the amount in controversy... federal courts may look outside those pleadings to other evidence in the record."
Here, the plaintiffs' complaint does not make any specific damages demand. Instead, the plaintiffs seek rent abatement for approximately 396 rental units plus monetary damages for personal injury and property damage, including actual damages and medical monitoring. The defendants contend that based upon the monthly rental range from $2700 to $3450 per month (Amend. Compl. at ¶¶ 4-9), the average monthly rent is $3075. Accordingly, the defendants contend that assuming the plaintiffs seek rent abatement of four months for the 211 units that were occupied by members of the putative class as it is defined in these actions, at least $2.59 million is in controversy in this action. Further, the defendants contend that it is "reasonably probable" that the plaintiffs' remaining claims, including those for medical monitoring, place an additional $2.41 million in controversy.
At the outset, the defendants reasonably presume that the demanded rent abatement period is four months based upon the time when tenants were first informed that they would have to vacate the Westbury Complex on November 27, 2007 until March 31, 2008, the date by which all units had to be emptied. Accordingly, the Court finds with reasonable probability that at least $2.59 million is in controversy based on the plaintiffs' claims for rent abatement alone.
Further, the defendants have established a reasonable probability that $5 million is in controversy based upon the plaintiffs' other claims, even absent the abatement demand. The defendants state that when the notice to vacate was initially circulated, there were more than one thousand residents of the Westbury Complex. Further, the plaintiffs' complaint seeks "ongoing diagnostic, curative and preventative medical care because of their exposure to toxic mold." (Amend. Compl. ¶ 63). The Court has previously upheld the viability of that claim. The value of such relief, when combined with the plaintiffs' additional claims for property damage; actual or potential personal injury; economic damage caused by defendants' alleged breach of the covenant of quiet enjoyment, breach of the warranty of habitability, and alleged deceptive acts in violation of New York G.B.L. § 349, easily places $5 million in controversy. See New Haverford P'ship v. Stroot, 772 A.2d 792, 801 (Del.2001) (upholding jury award of over $1 million in favor of a single tenant who suffered increased allergy and asthma symptoms and in favor of second tenant who experienced health problems, including frequent headaches and a permanent mold allergy, in the amount of $40,000, as a result of exposure to mold and bacteria growth in their apartments); see also Tamara L. Boeck & Linda M. Bolduan, Underlying Exposures in Mold Claims: What Are the Damages: With Mold Litigation Proliferating as the Claimed "Asbestos" of the New Century, it's Time to Examine the Potential Damages and their Viability, 70 Def. Couns. J. 218, 222 (2003) ("Plaintiffs in mold cases seek recovery for [among other things] damage to their personal property, including clothing, furniture and removable appliances."). Accordingly, the defendants have shown with reasonable probability that the jurisdictional amount is satisfied.

C. As to Minimal Diversity
The plaintiffs contend that even if the jurisdictional amount is satisfied, minimal diversity is lacking because the plaintiff class is made up solely of New York citizens and the sole defendant, Archstone Westbury, is a citizen of New York.
28 U.S.C. § 1332(d)(10) provides that "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." If these places differ, the organization may be a citizen of two states. Davis v. HSBC Bank of Nevada, N.A., No. 08CV5692, 2008 WL 4829880, at *1 (C.D.Cal. Nov.4, 2008) (analogizing citizenship of unincorporated associations under CAFA to the citizenship requirements for corporations and finding that "[f]or purposes of assessing diversity, a corporation has dual citizenship."). The defendant furnishes the affidavit of Thomas S. Reif, Associate General Counsel for Archstone Westbury, who states that "Tishman Speyer Archstone-Smith Westbury L.P. is a limited partnership organized under the laws of Delaware." (Reif aff. at ¶ 2). Accordingly, Archstone Westbury is a citizen of Delaware.
Archstone Westbury is also a citizen of the location of its principal place of business. "Courts within the Second Circuit determine principal place of business based on two tests: (1) the `nerve center' test; and (2) the `public impact' or `place of operations' test." Riklis v. Reese, No. 06CV6368, 2007 WL 1946536, at *4 (S.D.N.Y. June 28, 2007). Where a corporation's activities are decentralized and spread across numerous states, the "nerve center" test applies. Id. A corporation's nerve center is the place "from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in furtherance of the corporate objective." R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979) (quoting Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862, 865 (S.D.N.Y.1959)).
However, "[f]or corporations that have centralized operations or that concentrate their activities in a particular place, the place of business is determined by applying the `place of operations' or `public impact' test." Riklis, 2007 WL 1946536, at *4. "When ... corporate operations are centralized, courts have tended to de-emphasize the concentration on the corporate "nerve center" and to focus instead upon the state in which a corporation has its most extensive contacts with, or greatest impact on, the general public." R.G. Barry Corp., 612 F.2d at 655.
The two tests need not be rigidly applied. "Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be `straightjacketed by the formal requirements of each test,' but rather should adapt the tests to the facts of each case." Phoenix Four v. Strategic Resources Corp., 446 F.Supp.2d 205, 214-15 (S.D.N.Y.2006) (quoting Refco Properties, Inc. v. Trump, No. 94CV2124, 1995 WL 412423, at *9 (S.D.N.Y. July 12, 2995)). Such a flexible approach is appropriate where a corporation is neither farflung, nor conducts enough business in any one state to meet the traditional requirements of the place of operations test. Refco, 1995 WL 412423, at *9. In addition, even where the "place of operations" test is applied, courts frequently examine factors such as where the corporation maintains the majority of its business contacts; where its employees are located; where its corporate decisions are made; and where its business records are maintained. See, e.g., O'Donnell v. Club Mediterranee S.A., No. 05CV610, 2008 WL 794975, at *8 (E.D.N.Y. March 24, 2008) (reviewing the above-enumerated factors as part of the "locus of operations" test.).
Associate General Counsel of Archstone Westbury has stated that: "The sole business function of Tishman Speyer Archstone-Smith Westbury L.P. is to own the Archstone Westbury complex located at 1299 Corporate Drive, Westbury, New York, 11590." (Reif aff. at ¶ 3). The plaintiffs contend that this statement alone is an admission that New York is Archstone Westbury's principal place of business under the "place of operations" test and that the Court's inquiry should end there. Further, the plaintiffs contend that only the "place of operations" test is applicable because Archstone Westbury clearly has centralized operations.
The defendant contends that the "locus of operations test" does not apply to enterprises that do not sell products and employ personnel. In addition, the defendant contends that because it does not directly manage or operate the Westbury Complex, it has no service-oriented operations in New York. See Danbury Bowlarama Corp. v. RCA Corp., 414 F.Supp. 354, 357 (S.D.N.Y.1976) (finding that corporate owner of a bowling center in Connecticut had its principal place of business in New York and observing that "[t]he physical operations or locus of services test is simply not an accurate measure of corporate activity when the actual physical or service-oriented operations of the corporation are as limited as those of the plaintiff). Specifically, the defendant contends that on June 1, 2004, well-before this action was initiated, Archstone-Westbury executed a property management agreement with Archstone Communities LLC (a Colorado entity) that assigned responsibility for the operation, direction, management and supervision of the Westbury complex to Archstone Communities LLC. (Reif aff. at ¶ 4).
Also, the defendant notes that general and over-all management and business policy for Archstone-Westbury is formulated in Colorado; its certificate of limited partnership was executed in Colorado; all of its accounting, auditing, and primary cash management functions are conducted in Colorado; its address for state and federal taxation is in Colorado; and all of its legal functions are controlled and managed from Colorado. (Reif aff. at ¶¶ 8-12). However, the place from where management decisions are made, i.e. the nerve center, is not determinative where the business activities of a corporation have greater effects in another location. See R.G. Barry, 612 F.2d at 656; Inland Rubber Corp. v. Triple A Tire Service, Inc., 220 F.Supp. 490, 496 (S.D.N.Y.1963) (finding tire manufacturer had its principal place of business in New York where the majority of sales were made from New York, day to day control of the operation was in New York and the substantial number of employees were in New York, despite the fact that Ohio was the locus of over-all control).
Here, not only do the activities of Archstone Westbury have a public impact upon its tenants in New York, but the Court must also consider the impact on any employees in New York. Whether Archstone Westbury has employees is a disputed issue. In his affirmation, Associate General Counsel for the corporation has stated that Archstone Westbury has no employees, and all of its officers are located in other states, including nineteen in Colorado. (Reif aff. at ¶¶ 5, 7). However, the plaintiffs provide documentation to support that at least one officer or employee of Archstone Westbury was present on the premises in the Westbury Complex. Specifically, the plaintiffs provide six letters addressed to various tenants of the Westbury Complex signed by one Linda Early, as "Vice President" and sent from 1299 Corporate Drive, Westbury, N.Y. 11590. (Papp Decl. Exhs. 1-6). Further, in its opposition brief, the defendant states that it now has one officer in New York, but it is unclear whether the individual referred to is Ms. Early. In addition, as of December 14, 2007, a board of directors was created consisting of three New York based members. (Reif aff. at ¶ 6).
In R.G. Barry, the Second Circuit found corporate citizenship in New York where "[a]lthough the company's overall policies may be set in Mississippi and much of its administrative and manufacturing requirements contracted out to Mississippi firms, New York is the community in which [the defendant] engages in its most extensive contact with the public and the jurisdiction where it is least likely to suffer from `local prejudice.'" R.G. Barry, 612 F.2d at 656; see also Refco, 1995 WL 412423, at *9 (finding that the plaintiff corporation was not a citizen of New York where its existence in New York was obscured to the public and it would likely be viewed as an out of town entity).
Here, the visibility of Archstone Westbury in New York is indisputable. There can be little doubt that members of the public who have encountered the company name would perceive Archstone Westbury to be a local New York concern. Cf. Refco, 1995 WL 412423, at *5, *10; Sommer v. PMEC Assocs. and Co., Ltd., No. 88CV2537, 1989 WL 76197, at *3 (S.D.N.Y. July 6, 1989) (finding that owner entity of apartment complex known as the North Shore Towers in Floral Park, New York was not a New York citizen because it acted through other entities and its "visibility [was] so obscured in New York that it becomes arguable whether [the company] conducts any activity at all in New York").
Further, at issue in Refco was the citizenship of an entity, Refco, that was a member in a partnership, RLP, which owned the Grand Hyatt in New York. Refco, 1995 WL 412423, at *4. The Court found that because Refco's presence was obscured to members of the general public in New York and it was the partnership, RPL, that conducted business in New York, Refco was not a citizen of New York despite the large amount of revenue it derived from the Hyatt's operations. Id. at *4-6. Here, in contrast, the named defendant Archstone Westbury owns the Westbury Complex directly rather than through a partnership or other entity. Unlike Refco, here the Archstone Westbury entity is the corporate entity having the most contact with the general public in New York.
In addition, the plaintiffs present evidence that the address from which the defendant communicated with tenants at the Westbury Complex was a New York address at 1299 Corporate Drive, Westbury, N.Y. 11590. (Papp Decl. Exhs. 1-6). With reasonable certainty, it is likely that prospective tenants visited Archstone Westbury's office located at that address when entering into lease agreements.
On balance, the Court finds that the activities of Archstone Westbury are centralized, rather than far-flung and that the greatest impact of its business activities is in New York. All of these factors, considered together, point to New York as the principal place of business for Archstone Westbury. Thus, the sole defendant in these two cases is, for these purposes, a citizen of New York.
Accordingly, because the defendant has not established minimal diversity, federal jurisdiction is lacking and the Court must remand both of these actions to the Supreme Court for the State of New York, County of Nassau.

III. CONCLUSION

For the foregoing reasons it is hereby:
ORDERED, that the plaintiff's motion to remand both the Ventimiglia Action, 08cv1010, and In re Archstone Westbury Tenant Litigation, 08cv1751 to the Supreme Court for the State of New York, County of Nassau is granted; and it is further
ORDERED, that the Clerk of the Court is directed to close both cases.
SO ORDERED.